(Slip Opinion) OCTOBER TERM, 2018 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GUNDY *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 17–6086. Argued October 2, 2018—Decided June 20, 2019

Congress has sought, for the past quarter century, to combat sex crimes and crimes against children through sex-offender registration schemes. The Sex Offender Registration and Notification Act (SORNA) makes more "uniform and effective" the prior "patchwork" of registration systems. *Reynolds* v. *United States*, 565 U. S. 432, 435. To that end, it requires a broader range of sex offenders to register and backs up those requirements with criminal penalties. Section 20913 elaborates the "[i]nitial registration" requirements for sex offenders. 34 U. S. C. §§20913(b), (d). Subsection (b) sets out the general rule: An offender must register "before completing a sentence of imprisonment with respect to the offense giving rise to the registration requirement." §20913(b). Subsection (d) addresses the "[i]nitial registration of sex offenders unable to comply with subsection (b)." The provision states that, for individuals convicted of a sex offense before SORNA's enactment ("pre-Act offenders"), the Attorney General "shall have the authority" to "specify the applicability" of SORNA's registration requirements and "to prescribe rules for [their] registration." §20913(d). Under that delegated authority, the Attorney General issued a rule specifying that SORNA's registration requirements apply in full to pre-Act offenders. Petitioner Herman Gundy, a pre-Act offender, was convicted of failing to register. Both the District Court and the Second Circuit rejected his claim that Congress unconstitutionally delegated legislative power when it authorized the Attorney General to "specify the applicability" of SORNA's registration requirements to pre-Act offenders.

*Held*: The judgment is affirmed.

695 Fed. Appx. 639, affirmed.

JUSTICE KAGAN, joined by JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE SOTOMAYOR, concluded that §20913(d) does not violate the nondelegation doctrine. Pp. 4–18.

(a) Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." §1. Based on that provision, this Court explained early on that Congress may not transfer to another branch "powers which are strictly and exclusively legislative." *Wayman* v. *Southard*, 10 Wheat. 1, 42–43. But Congress may confer substantial discretion on executive agencies to implement and enforce the laws. Accordingly, the Court has held, time and time again, that a statutory delegation is constitutional as long as Congress "'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise that authority] is directed to conform.'" *Mistretta* v. *United States*, 488 U. S. 361, 372. Given that standard, a nondelegation inquiry always begins (and often almost ends) with statutory interpretation. Only after a court has determined a challenged statute's meaning can it decide whether the law sufficiently guides executive discretion to accord with Article I. Pp. 4–6.

(b) This Court has already interpreted §20913(d) to require the Attorney General to apply SORNA to all pre-Act offenders as soon as feasible. In *Reynolds* v. *United States*, 565 U. S. 432, the Court held that SORNA's registration requirements did not apply of their own force to pre-Act offenders. But in doing so, it made clear how far SORNA limited the Attorney General's authority and thereby effectively resolved this case. The Court started from the premise that Congress meant for SORNA's registration requirements to apply to pre-Act offenders, based on the Act's statutory purpose, its definition of sex offender, and its history. But the Court found that Congress had conditioned pre-Act offenders' duty to register on a prior ruling from the Attorney General because "instantaneous registration" of pre-Act offenders "might not prove feasible." *Id.,* at 440–441. SORNA, the majority explained, created a "practical problem[ ]" because it would require "newly registering or reregistering a large number of pre-Act offenders." *Id.,* at 440. In addition, many pre-Act offenders were already out of prison and could not comply with the requirement that they register before completing their sentences. Congress therefore "[a]sk[ed] the Department of Justice, charged with responsibility for implementation, to examine [the issues] and to apply the new registration requirements accordingly." *Id.,* at 441. On that understanding, the Attorney General's role under §20913(d) was important but limited: It was to apply SORNA to pre-Act offenders as soon as he thought it feasible to do so. Pp. 6–10.

(c) Gundy claims that §20913(d) empowers the Attorney General to

do whatever he wants as to pre-Act offenders, including exempting them from registration forever. He bases that argument on the first half of §20913(d), isolated from everything else. But this Court has long refused to construe words "in a vacuum," as Gundy attempts. *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 809. Rather, the Court interprets statutory provisions—including delegations—by reading the text in "context" and in light of the statutory "purpose." *National Broadcasting Co.* v. *United States*, 319 U. S. 190, 214, 216. Applying that approach here, it is clear that §20913(d) requires the Attorney General to register pre-Act offenders as soon as feasible. In SORNA's statement of purpose, Congress announced that "to protect the public," it was "establish[ing] a comprehensive national system for the registration" of "sex offenders." §20901. The term "comprehensive" means "all-encompassing" or "sweeping." That description could not fit the system SORNA created if the Attorney General could decline, for any reason or no reason at all, to apply SORNA to all pre-Act offenders. The Act's definition of "sex offender" makes the same point. Under that definition, a "sex offender" is "an individual who was convicted of a sex offense." §20911(1). Congress's use of the past tense shows that SORNA was not merely forward-looking and confirms that the delegation allows only temporary exclusions. The Act's legislative history backs that all up, by showing that the need to register pre-Act offenders was front and center in Congress's thinking. The text and title of §20913(d) then pinpoint one of the practical problems discussed above: At the moment of SORNA's enactment, many pre-Act offenders were "unable to comply" with the Act's initial registration requirements. §20913(d). In identifying that issue, §20913(d) itself reveals the nature of the delegation to the Attorney General. It was to give him the time needed (if any) to address the various implementation issues involved in getting pre-Act offenders into the registration system. Thus, contrary to Gundy, "specify the applicability" does not mean "specify *whether* to apply SORNA" to pre-Act offenders at all. The phrase instead means "specify *how* to apply SORNA" to pre-Act offenders if transitional difficulties require some delay. And no Attorney General has used §20913(d) in any more expansive way. Pp. 10–15.

(d) Section 20913(d)'s delegation therefore falls well within constitutional bounds. As noted, a delegation is constitutional so long as Congress sets out an intelligible principle to guide the delegee's exercise of authority. The standards for that principle are not demanding. See *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 474–475. Only twice in this country's history has the Court found a delegation excessive, in each case because "Congress had failed to articulate *any* policy or standard" to confine discretion. *Mistretta*, 488

U. S., at 373, n. 3; see *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495; *Panama Refining Co.* v. *Ryan*, 293 U. S. 388. By contrast, the Court has over and over upheld even very broad delegations. See, *e.g.*, *National Broadcasting Co.* v. *United States*, 319 U. S. 190. In that context, the delegation in SORNA easily passes muster. The authority §20913(d) confers, as compared to the delegations the Court has upheld in the past, is distinctly small bore. Indeed, if SORNA's delegation is unconstitutional, then most of Government is unconstitutional—dependent as Congress is on the need to give discretion to executive officials to implement its programs. Pp. 15–18.

JUSTICE ALITO concluded that he cannot say that the statute at issue lacks an adequately discernable standard under the nondelegation approach the Court has taken for the past 84 years, but would reconsider that approach in an appropriate case. P. 1.

KAGAN, J., announced the judgment of the Court and delivered an opinion, in which GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. ALITO, J., filed an opinion concurring in the judgment. GORSUCH, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS, J., joined. KAVANAUGH, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–6086

## HERMAN AVERY GUNDY, PETITIONER *v.* UNITED STATES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 20, 2019]

JUSTICE KAGAN announced the judgment of the Court and delivered an opinion, in which JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE SOTOMAYOR join.

The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government. This case requires us to decide whether 34 U. S. C. §20913(d), enacted as part of the Sex Offender Registration and Notification Act (SORNA), violates that doctrine. We hold it does not. Under §20913(d), the Attorney General must apply SORNA's registration requirements as soon as feasible to offenders convicted before the statute's enactment. That delegation easily passes constitutional muster.

I

Congress has sought, for the past quarter century, to combat sex crimes and crimes against children through sex-offender registration schemes. In 1994, Congress first conditioned certain federal funds on States' adoption of registration laws meeting prescribed minimum standards. See Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, §170101, 108

Stat. 2038, 42 U. S. C. §14071 *et seq.* (1994 ed.). Two years later, Congress strengthened those standards, most notably by insisting that States inform local communities of registrants' addresses. See Megan's Law, §2, 110 Stat. 1345, note following 42 U. S. C. §13701 (1994 ed., Supp. II). By that time, every State and the District of Columbia had enacted a sex-offender registration law. But the state statutes varied along many dimensions, and Congress came to realize that their "loopholes and deficiencies" had allowed over 100,000 sex offenders (about 20% of the total) to escape registration. See H. R. Rep. No. 109–218, pt. 1, pp. 20, 23–24, 26 (2005) (referring to those sex offenders as "missing" or "lost"). In 2006, to address those failings, Congress enacted SORNA. See 120 Stat. 590, 34 U. S. C. §20901 *et seq.*

SORNA makes "more uniform and effective" the prior "patchwork" of sex-offender registration systems. *Reynolds* v. *United States*, 565 U. S. 432, 435 (2012). The Act's express "purpose" is "to protect the public from sex offenders and offenders against children" by "establish[ing] a comprehensive national system for [their] registration." §20901. To that end, SORNA covers more sex offenders, and imposes more onerous registration requirements, than most States had before. The Act also backs up those requirements with new criminal penalties. Any person required to register under SORNA who knowingly fails to do so (and who travels in interstate commerce) may be imprisoned for up to ten years. See 18 U. S. C. §2250(a).

The basic registration scheme works as follows. A "sex offender" is defined as "an individual who was convicted of" specified criminal offenses: all offenses "involving a sexual act or sexual contact" and additional offenses "against a minor." 34 U. S. C. §§20911(1), (5)(A), (7). Such an individual must register—provide his name, address, and certain other information—in every State where he resides, works, or studies. See §§20913(a), 20914. And he

must keep the registration current, and periodically report in person to a law enforcement office, for a period of between fifteen years and life (depending on the severity of his crime and his history of recidivism). See §§20915, 20918.

Section 20913—the disputed provision here—elaborates the "[i]nitial registration" requirements for sex offenders. §§20913(b), (d). Subsection (b) sets out the general rule: An offender must register "before completing a sentence of imprisonment with respect to the offense giving rise to the registration requirement" (or, if the offender is not sentenced to prison, "not later than [three] business days after being sentenced"). Two provisions down, subsection (d) addresses (in its title's words) the "[i]nitial registration of sex offenders unable to comply with subsection (b)." The provision states:

> "The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter . . . and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b)."

Subsection (d), in other words, focuses on individuals convicted of a sex offense before SORNA's enactment—a group we will call pre-Act offenders. Many of these individuals were unregistered at the time of SORNA's enactment, either because pre-existing law did not cover them or because they had successfully evaded that law (so were "lost" to the system). See *supra,* at 2. And of those potential new registrants, many or most could not comply with subsection (b)'s registration rule because they had already completed their prison sentences. For the entire group of pre-Act offenders, once again, the Attorney General "shall have the authority" to "specify the applicability" of

SORNA's registration requirements and "to prescribe rules for [their] registration."

Under that delegated authority, the Attorney General issued an interim rule in February 2007, specifying that SORNA's registration requirements apply in full to "sex offenders convicted of the offense for which registration is required prior to the enactment of that Act." 72 Fed. Reg. 8897. The final rule, issued in December 2010, reiterated that SORNA applies to all pre-Act offenders. 75 Fed. Reg. 81850. That rule has remained the same to this day.

Petitioner Herman Gundy is a pre-Act offender. The year before SORNA's enactment, he pleaded guilty under Maryland law for sexually assaulting a minor. After his release from prison in 2012, Gundy came to live in New York. But he never registered there as a sex offender. A few years later, he was convicted for failing to register, in violation of §2250. He argued below (among other things) that Congress unconstitutionally delegated legislative power when it authorized the Attorney General to "specify the applicability" of SORNA's registration requirements to pre-Act offenders. §20913(d). The District Court and Court of Appeals for the Second Circuit rejected that claim, see 695 Fed. Appx. 639 (2017), as had every other court (including eleven Courts of Appeals) to consider the issue. We nonetheless granted certiorari. 583 U. S. __ (2018). Today, we join the consensus and affirm.

II

Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." §1. Accompanying that assignment of power to Congress is a bar on its further delegation. Congress, this Court explained early on, may not transfer to another branch "powers which are strictly and exclusively legislative." *Wayman* v. *Southard*, 10 Wheat. 1, 42–43 (1825). But the Constitution does not "deny[] to the

Congress the necessary resources of flexibility and practicality [that enable it] to perform its function[s]." *Yakus* v. *United States*, 321 U. S. 414, 425 (1944) (internal quotation marks omitted). Congress may "obtain[] the assistance of its coordinate Branches"—and in particular, may confer substantial discretion on executive agencies to implement and enforce the laws. *Mistretta* v. *United States*, 488 U. S. 361, 372 (1989). "[I]n our increasingly complex society, replete with ever changing and more technical problems," this Court has understood that "Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Ibid.* So we have held, time and again, that a statutory delegation is constitutional as long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." *Ibid.* (quoting *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 409 (1928); brackets in original).

Given that standard, a nondelegation inquiry always begins (and often almost ends) with statutory interpretation. The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion. So the answer requires construing the challenged statute to figure out what task it delegates and what instructions it provides. See, *e.g., Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 473 (2001) (construing the text of a delegation to place constitutionally adequate "limits on the EPA's discretion"); *American Power & Light Co.* v. *SEC*, 329 U. S. 90, 104–105 (1946) (interpreting a statutory delegation, in light of its "purpose[,] factual background[, and] context," to provide sufficiently "definite" standards). Only after a court has determined a challenged statute's meaning can it decide whether the law sufficiently guides executive discretion to accord with Article I. And indeed, once a court interprets

the statute, it may find that the constitutional question all but answers itself.

That is the case here, because §20913(d) does not give the Attorney General anything like the "unguided" and "unchecked" authority that Gundy says. Brief for Petitioner 37, 45. The provision, in Gundy's view, "grants the Attorney General plenary power to determine SORNA's applicability to pre-Act offenders—to require them to register, or not, as she sees fit, and to change her policy for any reason and at any time." *Id.,* at 42. If that were so, we would face a nondelegation question. But it is not. This Court has already interpreted §20913(d) to say something different—to require the Attorney General to apply SORNA to all pre-Act offenders as soon as feasible. See *Reynolds*, 565 U. S., at 442–443. And revisiting that issue yet more fully today, we reach the same conclusion. The text, considered alongside its context, purpose, and history, makes clear that the Attorney General's discretion extends only to considering and addressing feasibility issues. Given that statutory meaning, Gundy's constitutional claim must fail. Section 20913(d)'s delegation falls well within permissible bounds.

A

This is not the first time this Court has had to interpret §20913(d). In *Reynolds*, the Court considered whether SORNA's registration requirements applied of their own force to pre-Act offenders or instead applied only once the Attorney General said they did. We read the statute as adopting the latter approach. But even as we did so, we made clear how far SORNA limited the Attorney General's authority. And in that way, we effectively resolved the case now before us.

Everything in *Reynolds* started from the premise that Congress meant for SORNA's registration requirements to apply to pre-Act offenders. The majority recounted

SORNA's "basic statutory purpose," found in its text, as follows: "the 'establish[ment of] a comprehensive national system for the registration of [sex] offenders' that *includes* offenders who committed their offenses before the Act became law." 565 U. S., at 442 (quoting §20901; emphasis and alterations in original; citation omitted). That purpose, the majority further noted, informed SORNA's "broad[]" definition of "sex offender," which "include[s] any 'individual who *was* convicted of a sex offense.'" *Id.,* at 442 (quoting §20911(1); emphasis added). And those two provisions were at one with "[t]he Act's history." *Id.,* at 442. Quoting statements from both the House and the Senate about the sex offenders then "lost" to the system, *Reynolds* explained that the Act's "supporters placed considerable importance upon the registration of pre-Act offenders." *Ibid.* In recognizing all this, the majority (temporarily) bonded with the dissenting Justices, who found it obvious that SORNA was "meant to cover pre-Act offenders." *Id.,* at 448 (Scalia, J., dissenting). And indeed, the dissent emphasized that common ground, remarking that "the Court acknowledges" and "rightly believes" that registration of pre-Act offenders was "what the statute sought to achieve." *Id.,* at 448–449.[1]

But if that was so, why had Congress (as the majority held) conditioned the pre-Act offenders' duty to register on a prior "ruling from the Attorney General"? *Id.,* at 441. The majority had a simple answer: "*[I]nstantaneous* registration" of pre-Act offenders "might not prove feasible," or

_____

[1] As to that point, the dissent criticized the majority only for basing its view in part on legislative history. 565 U. S., at 448, n. (opinion of Scalia, J.). The dissent found the majority's excursion into history "quite superfluous" given that the "text of the Act itself makes clear that Congress sought" to ensure the registration of all pre-Act offenders. *Ibid.* In reaching that conclusion, the dissent relied on the Act's express statement of purpose and its "sex offender" definition. See *infra,* at 11–13.

"[a]t least Congress might well have so thought." *Id.,* at 440–441, 443. Here, the majority explained that SORNA's requirements diverged from prior state law. See *id.,* at 440; *supra,* at 2. Some pre-Act offenders (as defined by SORNA) had never needed to register before; others had once had to register, but had fulfilled their old obligations. And still others (the "lost" or "missing" offenders) should have registered, but had escaped the system. As a result, SORNA created a "practical problem[]": It would require "newly registering or reregistering a large number of pre-Act offenders." *Reynolds*, 565 U. S., at 440 (internal quotation marks omitted). And attached to that broad feasibility concern was a more technical one. Recall that under SORNA "a sex offender must initially register before completing his 'sentence of imprisonment.'" *Id.,* at 439 (quoting §20913(b)); see *supra,* at 3. But many pre-Act offenders were already out of prison, so could not comply with that requirement. That inability raised questions about "how[] the new registration requirements applied to them." 565 U. S., at 441. "Congress['s] solution" to both those difficulties was the same: Congress "[a]sk[ed] the Department of Justice, charged with responsibility for implementation, to examine [the issues] and to apply the new registration requirements accordingly." *Ibid.*

On that understanding, the Attorney General's role under §20913(d) was important but limited: It was to apply SORNA to pre-Act offenders as soon as he thought it feasible to do so. That statutory delegation, the Court explained, would "involve[] implementation delay." *Id.,* at 443. But no more than that. Congress had made clear in SORNA's text that the new registration requirements would apply to pre-Act offenders. See *id.,* at 442–445. So (the Court continued) "there was no need" for Congress to worry about the "unrealistic possibility" that "the Attorney General would refuse to apply" those requirements on some excessively broad view of his authority under

§20913(d). *Id.,* at 444–445. Reasonably read, SORNA enabled the Attorney General only to address (as appropriate) the "practical problems" involving pre-Act offenders before requiring them to register. *Id.,* at 440. The delegation was a stopgap, and nothing more.[2]

Gundy dismisses *Reynolds*'s relevance, but his arguments come up short. To begin, he contends that *Reynolds* spoke "tentative[ly]"—with "might[s], may[s], or could[s]"—about Congress's reasons for enacting §20913(d). Reply Brief 11; see *supra,* at 7 (quoting such phrases). Gundy concludes from such constructions—which are indeed present—that the Court was "not offering a definitive reading of the statute." Reply Brief 11. But the Court used those locutions to convey not its own uncertainty but Congress's. The point of the opinion was that Congress had questions about how best to phase SORNA's application to pre-Act offenders, so gave the Attorney General flexibility on timing. The "mights, mays, and coulds" were there to describe the legislative mindset responsible for §20913(d), and thus formed part of the Court's own—yes, "definitive"—view of that provision's meaning. Anticipating that explanation, Gundy falls back on the claim that the Court's account of Congress's motivations "cannot supply the intelligible principle Congress failed to enact into law." *Id.,* at 12 (citing *Whitman*, 531 U. S., at 473). But the Court in *Reynolds* did not invent a standard Congress omitted. Rather, the Court read the statute to contain a standard—again, that the Attorney

———————

[2] Once again, the dissent agreed with the Court that §20913(d) could not sensibly be read to give the Attorney General any greater power. "[I]t is simply implausible," the dissent concluded, "that the Attorney General was given discretion to determine whether coverage of pre-Act offenders (one of the purposes of the Act) should exist." 565 U. S., at 450 (opinion of Scalia, J.). The dissent parted ways with the Court only in interpreting §20913(d) to provide the Attorney General with even less authority.

General should apply SORNA to pre-Act offenders as soon as feasible. And as the next part of this opinion shows, in somewhat greater detail than *Reynolds* thought necessary, we read the statute in the same way.

B

Recall again the delegation provision at issue. Congress gave the Attorney General authority to "specify the applicability" of SORNA's requirements to pre-Act offenders. §20913(d). And in the second half of the same sentence, Congress gave him authority to "prescribe rules for the registration of any such sex offenders . . . who are unable to comply with" subsection (b)'s initial registration requirement. *Ibid.* What does the delegation in §20913(d) allow the Attorney General to do?

The different answers on offer here reflect competing views of statutory interpretation. As noted above, Gundy urges us to read §20913(d) to empower the Attorney General to do whatever he wants as to pre-Act offenders: He may make them all register immediately or he may exempt them from registration forever (or he may do anything in between). See Brief for Petitioner 41–42; *supra,* at 6. Gundy bases that argument on the first half of §20913(d), isolated from everything else—from the second half of the same section, from surrounding provisions in SORNA, and from any conception of the statute's history and purpose. *Reynolds* took a different approach (as does the Government here), understanding statutory interpretation as a "holistic endeavor" which determines meaning by looking not to isolated words, but to text in context, along with purpose and history. *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 371 (1988).

This Court has long refused to construe words "in a vacuum," as Gundy attempts. *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 809 (1989). "It is a fundamental

canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *National Assn. of Home Builders* v. *Defenders of Wildlife*, 551 U. S. 644, 666 (2007) (internal quotation marks omitted); see *Utility Air Regulatory Group* v. *EPA,* 573 U. S. 302, 321 (2014) ("[R]easonable statutory interpretation must account for both the specific context in which . . . language is used and the broader context of the statute as a whole" (internal quotation marks omitted)). And beyond context and structure, the Court often looks to "history [and] purpose" to divine the meaning of language. *Maracich* v. *Spears*, 570 U. S. 48, 76 (2013) (internal quotation marks omitted). That non-blinkered brand of interpretation holds good for delegations, just as for other statutory provisions. To define the scope of delegated authority, we have looked to the text in "context" and in light of the statutory "purpose." *National Broadcasting Co.* v. *United States*, 319 U. S. 190, 214, 216 (1943) (internal quotation marks omitted); see *American Power & Light*, 329 U. S., at 104 (stating that the delegation at issue "derive[d] much meaningful content from the purpose of the Act, its factual background and the statutory context"). In keeping with that method, we again do so today.

So begin at the beginning, with the "[d]eclaration of purpose" that is SORNA's first sentence. §20901. There, Congress announced (as *Reynolds* noted, see *supra,* at 6–7) that "to protect the public," it was "establish[ing] a comprehensive national system for the registration" of "sex offenders and offenders against children." §20901. The term "comprehensive" has a clear meaning—something that is all-encompassing or sweeping. See, *e.g.,* Webster's Third New International Dictionary 467 (2002) ("covering a matter under consideration completely or nearly completely"); New Oxford American Dictionary 350 (2d ed. 2005) ("complete; including all or nearly all elements or

aspects of something"). That description could not fit the system SORNA created if the Attorney General could decline, for any reason or no reason at all, to apply SORNA to all pre-Act offenders. After all, for many years after SORNA's enactment, the great majority of sex offenders in the country would be pre-Act offenders. If Gundy were right, all of those offenders could be exempt from SORNA's registration requirements. So the mismatch between SORNA's statement of purpose and Gundy's view of §20913(d) is as stark as stark comes. Responding to that patent disparity, Gundy urges us to ignore SORNA's statement of purpose because it is "located in the Act's preface" rather than "tied" specifically to §20913(d). Brief for Petitioner 46. But the placement of such a statement within a statute makes no difference. See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 220 (2012). Wherever it resides, it is "an appropriate guide" to the "meaning of the [statute's] operative provisions." *Id.,* at 218. And here it makes clear that SORNA was supposed to apply to all pre-Act offenders—which precludes Gundy's construction of §20913(d).

The Act's definition of "sex offender" (also noted in *Reynolds*, see *supra,* at 7) makes the same point. Under that definition, a "sex offender" is "an individual who was convicted of a sex offense." §20911(1). Note the tense: "was," not "is." This Court has often "looked to Congress' choice of verb tense to ascertain a statute's temporal reach," including when interpreting other SORNA provisions. *Carr* v. *United States*, 560 U. S. 438, 447–448 (2010) (holding that because SORNA "sets forth [its] travel requirement in the present tense," the statute's criminal penalties do not apply to a person whose interstate travel predated enactment); see, *e.g., United States* v. *Wilson*, 503 U. S. 329, 333 (1992); *Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Foundation, Inc.*, 484 U. S. 49, 57 (1987). Here, Congress's use of the past tense to define the term

"sex offender" shows that SORNA was not merely forward-looking. The word "is" would have taken care of all future offenders. The word "was" served to bring in the hundreds of thousands of persons previously found guilty of a sex offense, and thought to pose a current threat to the public. The tense of the "sex offender" definition thus confirms that the delegation allows only temporary exclusions, as necessary to address feasibility issues. Contra Gundy, it does not sweep so wide as to make a laughingstock of the statute's core definition.

The Act's legislative history backs up everything said above by showing that the need to register pre-Act offenders was front and center in Congress's thinking. (Once again, the *Reynolds* majority noted this history, but Justice Scalia's dissent thought that was gilding the lily. See *supra,* at 7, and n. 1. He had a point, but we can't resist.) Recall that Congress designed SORNA to address "loopholes and deficiencies" in existing registration laws. See *supra,* at 2. And no problem attracted greater attention than the large number of sex offenders who had slipped the system. According to the House Report, "[t]he most significant enforcement issue in the sex offender program is that over 100,000 sex offenders" are "'missing,' meaning that they have not complied with" then-current requirements. H. R. Rep. No. 109–218, at 26. There is a "strong public interest," the Report continued, in "having [those offenders] register with current information to mitigate the risks of additional crimes against children." *Id.,* at 24. Senators struck a similar chord in the debates preceding SORNA's passage, repeatedly stressing that the new provisions would capture the missing offenders. See, *e.g.,* 152 Cong. Rec. 15338 (2006) (statement of Sen. Kyl) ("The penalties in this bill should be adequate to ensure that [the 100,000 missing offenders] register"); *id.,* at 13050 (statement of Sen. Frist) ("Every day that we don't have this national sex offender registry, these missing sex

predators are out there somewhere"). Imagine how sur-
prising those Members would have found Gundy's view
that they had authorized the Attorney General to exempt
the missing "predators" from registering at all.

With that context and background established, we may
return to §20913(d). As we have noted, Gundy makes his
stand there (and there only), insisting that the lonesome
phrase "specify the applicability" ends this case. See
*supra,* at 10. But in so doing, Gundy ignores even the rest
of the section that phrase is in. Both the title and the
remaining text of that section pinpoint one of the "practi-
cal problems" discussed above: At the moment of SORNA's
enactment, many pre-Act offenders were "unable to com-
ply" with the Act's initial registration requirements.
§20913(d); *Reynolds,* 565 U. S., at 440; see *supra,* at 8.
That was because, once again, the requirements assumed
that offenders would be in prison, whereas many pre-Act
offenders were on the streets. In identifying that issue,
§20913(d) itself reveals the nature of the delegation to the
Attorney General. It was to give him the time needed (if
any) to address the various implementation issues in-
volved in getting pre-Act offenders into the registration
system. "Specify the applicability" thus does not mean
"specify *whether* to apply SORNA" to pre-Act offenders at
all, even though everything else in the Act commands
their coverage. The phrase instead means "specify *how* to
apply SORNA" to pre-Act offenders if transitional difficul-
ties require some delay. In that way, the whole of
§20913(d) joins the rest of SORNA in giving the Attorney
General only time-limited latitude to excuse pre-Act of-
fenders from the statute's requirements. Under the law,
he had to order their registration as soon as feasible.

And no Attorney General has used (or, apparently,
thought to use) §20913(d) in any more expansive way. To
the contrary. Within a year of SORNA's enactment (217
days, to be precise), the Attorney General determined that

SORNA would apply immediately to pre-Act offenders. See Interim Rule, 72 Fed. Reg. 8897; *supra,* at 4. That rule has remained in force ever since (save for a technical change to one of the rule's illustrative examples). See Final Rule, 75 Fed. Reg. 81850.[3] And at oral argument here, the Solicitor General's office—rarely in a hurry to agree to limits on the Government's authority—acknowledged that §20913(d) does not allow the Attorney General to excuse a pre-Act offender from registering, except for reasons of "feasibility." Tr. of Oral Arg. 41–42. We thus end up, on close inspection of the statutory scheme, exactly where *Reynolds* left us. The Attorney General's authority goes to transition-period implementation issues, and no further.

C

Now that we have determined what §20913(d) means, we can consider whether it violates the Constitution. The question becomes: Did Congress make an impermissible delegation when it instructed the Attorney General to apply SORNA's registration requirements to pre-Act offenders as soon as feasible? Under this Court's long-established law, that question is easy. Its answer is no.

As noted earlier, this Court has held that a delegation is constitutional so long as Congress has set out an "intelligible principle" to guide the delegee's exercise of authority.

_____

[3] Gundy tries to dispute that simple fact, but fails. He points to changes that Attorneys General have made in guidelines to States about how to satisfy SORNA's funding conditions. See Brief for Petitioner 32–33. But those state-directed rules are independent of the only thing at issue here: the application of registration requirements to pre-Act offenders. Those requirements have been constant since the Attorney General's initial rule, as the guidelines themselves affirm. See 73 Fed. Reg. 38046 (2008); 76 Fed. Reg. 1639 (2011). Indeed, the guidelines to States are issued not under §20913(d) at all, but under a separate delegation in §20912(b). See 73 Fed. Reg. 38030; 76 Fed. Reg. 1631.

*J. W. Hampton, Jr., & Co.*, 276 U. S., at 409; see *supra,* at 5. Or in a related formulation, the Court has stated that a delegation is permissible if Congress has made clear to the delegee "the general policy" he must pursue and the "boundaries of [his] authority." *American Power & Light*, 329 U. S., at 105. Those standards, the Court has made clear, are not demanding. "[W]e have 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" *Whitman*, 531 U. S., at 474–475 (quoting *Mistretta*, 488 U. S., at 416 (Scalia, J., dissenting)). Only twice in this country's history (and that in a single year) have we found a delegation excessive—in each case because "Congress had failed to articulate *any* policy or standard" to confine discretion. *Mistretta*, 488 U. S., at 373, n. 7 (emphasis added); see *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495 (1935); *Panama Refining Co.* v. *Ryan*, 293 U. S. 388 (1935). By contrast, we have over and over upheld even very broad delegations. Here is a sample: We have approved delegations to various agencies to regulate in the "public interest." See, *e.g., National Broadcasting Co.*, 319 U. S., at 216; *New York Central Securities Corp.* v. *United States*, 287 U. S. 12, 24 (1932). We have sustained authorizations for agencies to set "fair and equitable" prices and "just and reasonable" rates. *Yakus*, 321 U. S., at 422, 427; *FPC* v. *Hope Natural Gas Co.*, 320 U. S. 591 (1944). We more recently affirmed a delegation to an agency to issue whatever air quality standards are "requisite to protect the public health." *Whitman*, 531 U. S., at 472 (quoting 42 U. S. C. §7409(b)(1)). And so forth.

  In that context, the delegation in SORNA easily passes muster (as all eleven circuit courts to have considered the question found, see *supra,* at 4). The statute conveyed Congress's policy that the Attorney General require pre-Act offenders to register as soon as feasible. Under the

law, the feasibility issues he could address were administrative—and, more specifically, transitional—in nature. Those issues arose, as *Reynolds* explained, from the need to "newly register[] or reregister[] 'a large number' of pre-Act offenders" not then in the system. 565 U. S., at 440; see *supra,* at 8. And they arose, more technically, from the gap between an initial registration requirement hinged on imprisonment and a set of pre-Act offenders long since released. See 565 U. S., at 441; see *supra,* at 8. Even for those limited matters, the Act informed the Attorney General that he did not have forever to work things out. By stating its demand for a "comprehensive" registration system and by defining the "sex offenders" required to register to include pre-Act offenders, Congress conveyed that the Attorney General had only temporary authority. Or again, in the words of *Reynolds*, that he could prevent "*instantaneous* registration" and impose some "implementation delay." 565 U. S., at 443. That statutory authority, as compared to the delegations we have upheld in the past, is distinctly small-bore. It falls well within constitutional bounds.[4]

Indeed, if SORNA's delegation is unconstitutional, then most of Government is unconstitutional—dependent as Congress is on the need to give discretion to executive officials to implement its programs. Consider again this Court's long-time recognition: "Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U. S., at 372; see *supra*, at 5. Or as the dissent in that case agreed: "[S]ome judgments . . . must be left to the officers executing the law." 488 U. S., at 415 (opinion of Scalia, J.); see *Whitman*, 531

———————

[4] Even Gundy conceded at oral argument that if the statute means what we have said, it "likely would be constitutional." Tr. of Oral Arg. 25. That is why all of his argument is devoted to showing that it means something else.

U. S., at 475 ("[A] certain degree of discretion[] inheres in most executive" action (internal quotation marks omitted)). Among the judgments often left to executive officials are ones involving feasibility. In fact, standards of that kind are ubiquitous in the U. S. Code. See, *e.g.,* 12 U. S. C. §1701z–2(a) (providing that the Secretary of Housing and Urban Development "shall require, to the greatest extent feasible, the employment of new and improved technologies, methods, and materials in housing construction[] under [HUD] programs"); 47 U. S. C. §903(d)(1) (providing that "the Secretary of Commerce shall promote efficient and cost-effective use of the spectrum to the maximum extent feasible" in "assigning frequencies for mobile radio services"). In those delegations, Congress gives its delegee the flexibility to deal with real-world constraints in carrying out his charge. So too in SORNA.

It is wisdom and humility alike that this Court has always upheld such "necessities of government." *Mistretta*, 488 U. S., at 416 (Scalia, J., dissenting) (internal quotation marks omitted); see *ibid.* ("Since Congress is no less endowed with common sense than we are, and better equipped to inform itself of the 'necessities' of government; and since the factors bearing upon those necessities are both multifarious and (in the nonpartisan sense) highly political . . . it is small wonder that we have almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law"). We therefore affirm the judgment of the Court of Appeals.

*It is so ordered.*


JUSTICE KAVANAUGH took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 17–6086

―――――――

## HERMAN AVERY GUNDY, PETITIONER *v.* UNITED STATES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 20, 2019]

JUSTICE ALITO, concurring in the judgment.

The Constitution confers on Congress certain "legislative [p]owers," Art. I, §1, and does not permit Congress to delegate them to another branch of the Government. See *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 472 (2001). Nevertheless, since 1935, the Court has uniformly rejected nondelegation arguments and has upheld provisions that authorized agencies to adopt important rules pursuant to extraordinarily capacious standards. See *ibid.*

If a majority of this Court were willing to reconsider the approach we have taken for the past 84 years, I would support that effort. But because a majority is not willing to do that, it would be freakish to single out the provision at issue here for special treatment.

Because I cannot say that the statute lacks a discernable standard that is adequate under the approach this Court has taken for many years, I vote to affirm.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–6086

_____

## HERMAN AVERY GUNDY, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 20, 2019]

JUSTICE GORSUCH, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

The Constitution promises that only the people's elected representatives may adopt new federal laws restricting liberty. Yet the statute before us scrambles that design. It purports to endow the nation's chief prosecutor with the power to write his own criminal code governing the lives of a half-million citizens. Yes, those affected are some of the least popular among us. But if a single executive branch official can write laws restricting the liberty of this group of persons, what does that mean for the next?

Today, a plurality of an eight-member Court endorses this extraconstitutional arrangement but resolves nothing. Working from an understanding of the Constitution at war with its text and history, the plurality reimagines the terms of the statute before us and insists there is nothing wrong with Congress handing off so much power to the Attorney General. But JUSTICE ALITO supplies the fifth vote for today's judgment and he does not join either the plurality's constitutional or statutory analysis, indicating instead that he remains willing, in a future case with a full Court, to revisit these matters. Respectfully, I would not wait.

I

For individuals convicted of sex offenses *after* Congress adopted the Sex Offender Registration and Notification Act (SORNA) in 2006, the statute offers detailed instructions. It requires them "to provide state governments with (and to update) information, such as names and current addresses, for inclusion on state and federal sex offender registries."[1] The law divides offenders into three tiers based on the seriousness of their crimes: Some must register for 15 years, others for 25 years, and still others for life.[2] The statute proceeds to set registration deadlines: Offenders sentenced to prison must register before they're released, while others must register within three business days after sentencing.[3] The statute explains when and how offenders must update their registrations.[4] And the statute specifies particular penalties for failing to comply with its commands.[5] On and on the statute goes for more than 20 pages of the U. S. Code.

But what about those convicted of sex offenses *before* the Act's adoption? At the time of SORNA's enactment, the nation's population of sex offenders exceeded 500,000, and Congress concluded that something had to be done about these "pre-Act" offenders too. But it seems Congress couldn't agree what that should be. The treatment of pre-Act offenders proved a "controversial issue with major policy significance and practical ramifications for states."[6] Among other things, applying SORNA immediately to this group threatened to impose unpopular and costly burdens

––––––––––

[1] *Reynolds* v. *United States*, 565 U. S. 432, 434 (2012).

[2] 34 U. S. C. §§20911, 20915(a).

[3] §20913(b).

[4] §20913(c).

[5] §20913(e).

[6] Logan, The Adam Walsh Act and the Failed Promise of Administrative Federalism, 78 Geo. Wash. L. Rev. 993, 999–1000 (2010).

on States and localities by forcing them to adopt or over-haul their own sex offender registration schemes.[7]  So Congress simply passed the problem to the Attorney General.  For all half-million pre-Act offenders, the law says only this, in 34 U. S. C. §20913(d):

> "The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the en-actment of this chapter . . . and to prescribe rules for the registration of any such sex offender."

Yes, that's it.  The breadth of the authority Congress granted to the Attorney General in these few words can only be described as vast.  As the Department of Justice itself has acknowledged, SORNA "does not require the Attorney General" to impose registration requirements on pre-Act offenders "within a certain time frame or by a date certain; it does not require him to act at all."[8]  If the At-torney General does choose to act, he can require all pre-Act offenders to register, or he can "require some but not all to register."[9]  For those he requires to register, the Attorney General may impose "some but not all of [SORNA's] registration requirements," as he pleases.[10]  And he is free to change his mind on any of these matters "at any given time or over the course of different [political] administrations."[11]  Congress thus gave the Attorney General free rein to write the rules for virtually the entire existing sex offender population in this country—a situa-tion that promised to persist for years or decades until

---

[7] *Id.*, at 1003–1004.

[8] Brief for United States in *Reynolds* v. *United States*, O. T. 2011, No. 10–6549, p. 23.

[9] *Id.*, at 24.

[10] *Ibid.*

[11] *Ibid.*

pre-Act offenders passed away or fulfilled the terms of their registration obligations and post-Act offenders came to predominate.

Unsurprisingly, different Attorneys General have exercised their discretion in different ways.[12] For six months after SORNA's enactment, Attorney General Gonzales left past offenders alone. Then the pendulum swung the other direction when the Department of Justice issued an interim rule requiring pre-Act offenders to follow all the same rules as post-Act offenders.[13] A year later, Attorney General Mukasey issued more new guidelines, this time directing the States to register some but not all past offenders.[14] Three years after that, Attorney General Holder required the States to register only those pre-Act offenders convicted of a new felony after SORNA's enactment.[15] Various Attorneys General have also taken different positions on whether pre-Act offenders might be entitled to credit for time spent in the community before SORNA was enacted.[16]

These unbounded policy choices have profound consequences for the people they affect. Take our case. Before SORNA's enactment, Herman Gundy pleaded guilty in 2005 to a sexual offense. After his release from prison five years later, he was arrested again, this time for failing to register as a sex offender according to the rules the Attorney General had then prescribed for pre-Act offenders. As a result, Mr. Gundy faced an additional 10-year prison term—10 years more than if the Attorney General had, in

---

[12] See, *e.g.*, 72 Fed. Reg. 8894 (2007); 73 Fed. Reg. 38030 (2008); 76 Fed. Reg. 1639 (2011).

[13] 28 CFR §72.3 (2007); 72 Fed. Reg. 8894.

[14] See 73 Fed. Reg. 38030.

[15] See 76 Fed. Reg. 1639.

[16] Compare 73 Fed. Reg. 38036 (no credit given) with 75 Fed. Reg. 81851 (full credit given).

his discretion, chosen to write the rules differently.

## II
## A

Our founding document begins by declaring that "We the People . . . ordain and establish this Constitution." At the time, that was a radical claim, an assertion that sovereignty belongs not to a person or institution or class but to the whole of the people. From that premise, the Constitution proceeded to vest the authority to exercise different aspects of the people's sovereign power in distinct entities. In Article I, the Constitution entrusted all of the federal government's legislative power to Congress. In Article II, it assigned the executive power to the President. And in Article III, it gave independent judges the task of applying the laws to cases and controversies.

To the framers, each of these vested powers had a distinct content. When it came to the legislative power, the framers understood it to mean the power to adopt generally applicable rules of conduct governing future actions by private persons—the power to "prescrib[e] the rules by which the duties and rights of every citizen are to be regulated,"[17] or the power to "prescribe general rules for the government of society."[18]

The framers understood, too, that it would frustrate "the system of government ordained by the Constitution" if Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals.[19] Through the Constitution, after

---

[17] The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton).

[18] *Fletcher* v. *Peck*, 6 Cranch 87, 136 (1810); see also J. Locke, The Second Treatise of Civil Government and a Letter Concerning Toleration §22, p. 13 (1947) (Locke, Second Treatise); 1 W. Blackstone, Commentaries on the Laws of England 44 (1765).

[19] *Marshall Field & Co.* v. *Clark*, 143 U. S. 649, 692 (1892).

all, the people had vested the power to prescribe rules limiting their liberties in Congress alone. No one, not even Congress, had the right to alter that arrangement. As Chief Justice Marshall explained, Congress may not "delegate . . . powers which are strictly and exclusively legislative."[20]  Or as John Locke, one of the thinkers who most influenced the framers' understanding of the separation of powers, described it:

> "The legislative cannot transfer the power of making laws to any other hands; for it being but a delegated power from the people, they who have it cannot pass it over to others. The people alone can appoint the form of the commonwealth, which is by constituting the legislative, and appointing in whose hands that shall be. And when the people have said we will submit to rules, and be governed by laws made by such men, and in such forms, nobody else can say other men shall make laws for them; nor can the people be bound by any laws but such as are enacted by those whom they have chosen and authorised to make laws for them."[21]

Why did the framers insist on this particular arrangement? They believed the new federal government's most dangerous power was the power to enact laws restricting the people's liberty.[22]  An "excess of law-making" was, in their words, one of "the diseases to which our governments are most liable."[23]  To address that tendency, the framers went to great lengths to make lawmaking difficult. In Article I, by far the longest part of the Constitution, the

---

[20] *Wayman* v. *Southard*, 10 Wheat. 1, 42–43 (1825).

[21] Locke, Second Treatise §141, at 71.

[22] The Federalist No. 48, at 309–312 (J. Madison).

[23] *Id.*, No. 62, at 378.  See also *id.*, No. 73, at 441–442 (Hamilton); Locke, Second Treatise §143.

framers insisted that any proposed law must win the approval of two Houses of Congress—elected at different times, by different constituencies, and for different terms in office—and either secure the President's approval or obtain enough support to override his veto. Some occasionally complain about Article I's detailed and arduous processes for new legislation, but to the framers these were bulwarks of liberty.

Nor was the point only to limit the government's capacity to restrict the people's freedoms. Article I's detailed processes for new laws were also designed to promote deliberation. "The oftener the measure is brought under examination," Hamilton explained, "the greater the diversity in the situations of those who are to examine it," and "the less must be the danger of those errors which flow from want of due deliberation, or of those missteps which proceed from the contagion of some common passion or interest."[24]

Other purposes animated the framers' design as well. Because men are not angels[25] and majorities can threaten minority rights, the framers insisted on a legislature composed of different bodies subject to different electorates as a means of ensuring that any new law would have to secure the approval of a supermajority of the people's representatives. This, in turn, assured minorities that their votes would often decide the fate of proposed legislation. Indeed, some even thought a Bill of Rights would prove unnecessary in light of the Constitution's design; in their view, sound structures forcing "[a]mbition [to] . . . counteract ambition" would do more than written promises to guard unpopular minorities from the tyranny

––––––––

[24] The Federalist No. 73, at 443.

[25] *Id.*, No. 51, at 322 (Madison); D. Schoenbrod, Power Without Responsibility 29 (1993) (Schoenbrod).

of the majority.[26]  Restricting the task of legislating to one branch characterized by difficult and deliberative processes was also designed to promote fair notice and the rule of law, ensuring the people would be subject to a relatively stable and predictable set of rules.[27]  And by directing that legislating be done only by elected representatives in a public process, the Constitution sought to ensure that the lines of accountability would be clear: The sovereign people would know, without ambiguity, whom to hold accountable for the laws they would have to follow.[28]

If Congress could pass off its legislative power to the executive branch, the "[v]esting [c]lauses, and indeed the entire structure of the Constitution," would "make no sense."[29]  Without the involvement of representatives from across the country or the demands of bicameralism and presentment, legislation would risk becoming nothing more than the will of the current President.  And if laws could be simply declared by a single person, they would not be few in number, the product of widespread social consensus, likely to protect minority interests, or apt to provide stability and fair notice.[30]  Accountability would suffer too.  Legislators might seek to take credit for addressing a pressing social problem by sending it to the executive for resolution, while at the same time blaming the executive for the problems that attend whatever measures he chooses to pursue.  In turn, the executive might point to Congress as the source of the problem.  These opportunities for finger-pointing might prove tempt-

--------

[26] The Federalist No. 51, at 322.  See also *id.*, No. 84, at 515 (Hamilton).

[27] *Id.*, No. 62, at 378–380.

[28] Schoenbrod 99; see also The Federalist No. 50, at 316 (Madison).

[29] Lawson, Delegation and Original Meaning, 88 Va. L. Rev. 327, 340 (2002).

[30] The Federalist No. 47, at 303 (Madison); *id.*, No. 62, at 378 (same).

ingly advantageous for the politicians involved, but they would also threaten to "'disguise . . . responsibility for . . . the decisions.'"[31]

The framers warned us against permitting consequences like these. As Madison explained, "'[t]here can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates.'"[32] The framers knew, too, that the job of keeping the legislative power confined to the legislative branch couldn't be trusted to self-policing by Congress; often enough, legislators will face rational incentives to pass problems to the executive branch. Besides, enforcing the separation of powers isn't about protecting institutional prerogatives or governmental turf. It's about respecting the people's sovereign choice to vest the legislative power in Congress alone. And it's about safeguarding a structure designed to protect their liberties, minority rights, fair notice, and the rule of law. So when a case or controversy comes within the judicial competence, the Constitution does not permit judges to look the other way; we must call foul when the constitutional lines are crossed. Indeed, the framers afforded us independence from the political branches in large part to encourage exactly this kind of "fortitude . . . to do [our] duty as faithful guardians of the Constitution."[33]

------

[31] Rao, Administrative Collusion: How Delegation Diminishes the Collective Congress, 90 N. Y. U. L. Rev. 1463, 1478 (2015). See also B. Iancu, Legislative Delegation: The Erosion of Normative Limits in Modern Constitutionalism 87 (2012).

[32] The Federalist No. 47, at 302 (Madison). Accord, 1 Blackstone, Commentaries on the Laws of England, at 142; see also Cass, Delegation Reconsidered: A Delegation Doctrine for the Modern Administrative State, 40 Harv. J. L. & Pub. Pol'y 147, 153 (2016).

[33] The Federalist No. 78, at 470.

B

Accepting, then, that we have an obligation to decide whether Congress has unconstitutionally divested itself of its legislative responsibilities, the question follows: What's the test? Madison acknowledged that "no skill in the science of government has yet been able to discriminate and define, with sufficient certainty, its three great provinces—the legislative, executive, and judiciary."[34] Chief Justice Marshall agreed that policing the separation of powers "is a subject of delicate and difficult inquiry."[35] Still, the framers took this responsibility seriously and offered us important guiding principles.

First, we know that as long as Congress makes the policy decisions when regulating private conduct, it may authorize another branch to "fill up the details." In *Wayman* v. *Southard*, this Court upheld a statute that instructed the federal courts to borrow state-court procedural rules but allowed them to make certain "alterations and additions." Writing for the Court, Chief Justice Marshall distinguished between those "important subjects, which must be entirely regulated by the legislature itself," and "those of less interest, in which a general provision may be made, and power given to those who are to act . . . to fill up the details."[36] The Court upheld the statute before it because Congress had announced the controlling general policy when it ordered federal courts to follow state procedures, and the residual authority to make "alterations and additions" did no more than permit courts to fill up the details.

Later cases built on Chief Justice Marshall's understanding. In *In re Kollock*, for example, the Court upheld

---

[34] *Id.*, No. 37, at 228 (Madison).

[35] *Wayman*, 10 Wheat., at 46.

[36] *Id.*, at 31, 43.

a statute that assigned the Commissioner of Internal Revenue the responsibility to design tax stamps for margarine packages.[37]  Later still, and using the same logic, the Court sustained other and far more consequential statutes, like a law authorizing the Secretary of Agriculture to adopt rules regulating the "use and occupancy" of public forests to protect them from "destruction" and "depredations."[38]  Through all these cases, small or large, runs the theme that Congress must set forth standards "sufficiently definite and precise to enable Congress, the courts, and the public to ascertain" whether Congress's guidance has been followed.[39]

Second, once Congress prescribes the rule governing private conduct, it may make the application of that rule depend on executive fact-finding.  Here, too, the power extended to the executive may prove highly consequential.  During the Napoleonic Wars, for example, Britain and France each tried to block the United States from trading with the other.  Congress responded with a statute instructing that, if the President found that either Great Britain or France stopped interfering with American trade, a trade embargo would be imposed against the other country.  In *Cargo of Brig Aurora* v. *United States*, this Court explained that it could "see no sufficient reason, why the legislature should not exercise its discretion [to impose an embargo] either expressly or *conditionally*, as their judgment should direct."[40]  Half a century later, Congress likewise made the construction of the Brooklyn Bridge depend on a finding by the Secretary of War that

––––––––

[37] 165 U. S. 526, 532 (1897).

[38] *United States* v. *Grimaud*, 220 U. S. 506, 522 (1911).  See also *Buttfield* v. *Stranahan*, 192 U. S. 470, 496 (1904); *ICC* v. *Goodrich Transit Co.*, 224 U. S. 194, 210, 215 (1912).

[39] *Yakus* v. *United States*, 321 U. S. 414, 426 (1944).

[40] 7 Cranch 382, 388 (1813) (emphasis added).

the bridge wouldn't interfere with navigation of the East River. The Court held that Congress "did not abdicate any of its authority" but "simply declared that, upon a certain fact being established, the bridge should be deemed a lawful structure, and employed the secretary of war as an agent to ascertain that fact."[41]

Third, Congress may assign the executive and judicial branches certain non-legislative responsibilities. While the Constitution vests all federal legislative power in Congress alone, Congress's legislative authority sometimes overlaps with authority the Constitution separately vests in another branch.[42] So, for example, when a congressional statute confers wide discretion to the executive, no separation-of-powers problem may arise if "the discretion is to be exercised over matters already within the scope of executive power."[43] Though the case was decided on different grounds, the foreign-affairs-related statute in *Cargo of the Brig Aurora* may be an example of this kind of permissible lawmaking, given that many foreign affairs powers are constitutionally vested in the president under Article II. *Wayman* itself might be explained by the same principle as applied to the judiciary: Even in the absence of any statute, courts have the power under Article III "to regulate their practice."[44]

## C

Before the 1930s, federal statutes granting authority to

--------

[41] *Miller* v. *Mayor of New York*, 109 U. S. 385, 393 (1883).

[42] See *Loving* v. *United States*, 517 U. S. 748, 768 (1996); *id.*, at 776 (Scalia, J., concurring in part and concurring in judgment); *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 320 (1936); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635 (1952) (Jackson, J., concurring).

[43] Schoenbrod, The Delegation Doctrine: Could the Court Give It Substance? 83 Mich. L. Rev. 1223, 1260 (1985).

[44] 10 Wheat., at 43.

the executive were comparatively modest and usually easily upheld. But then the federal government began to grow explosively. And with the proliferation of new executive programs came new questions about the scope of congressional delegations. Twice the Court responded by striking down statutes for violating the separation of powers.

In *A. L. A. Schechter Poultry Corp.* v. *United States*, the Court considered a statute that transferred to the President the power "to approve 'codes of fair competition'" for slaughterhouses and other industries.[45]  But Congress offered no meaningful guidance. It did not, for example, reference any pre-existing common law of fair competition that might have supplied guidance on the policy questions, as it arguably had done earlier with the Sherman Act.[46] And it did not announce rules contingent on executive fact-finding. Nor was this assigned power one that anyone thought might inhere in the executive power. Proceeding without the need to convince a majority of legislators, the President adopted a lengthy fair competition code written by a group of (possibly self-serving) New York poultry butchers.

Included in the code was a rule that often made it a federal crime for butchers to allow customers to select which individual chickens they wished to buy. Kosher butchers such as the Schechters had a hard time following these rules. Yet the government apparently singled out the Schechters as a test case; inspectors repeatedly visited them and, at times, apparently behaved abusively toward their customers. When the Schechters finally kicked the

_____

[45] 295 U. S. 495, 521–522 (1935).

[46] See *State Oil Co.* v. *Khan*, 522 U. S. 3, 21 (1997); *National Soc. of Professional Engineers* v. *United States*, 435 U. S. 679, 688 (1978); Letwin, The English Common Law Concerning Monopolies, 21 U. Chi. L. Rev. 355 (1954).

inspectors out, they were greeted with a criminal indict-
ment running to dozens of counts.  After a trial in which
the Schechters were found guilty of selling one allegedly
"unfit" chicken and other miscellaneous counts,[47] this
Court agreed to hear the case and struck down the law as
a violation of the separation of powers.  If Congress could
permit the President to write a new code of fair competi-
tion all his own, Justice Cardozo explained, then "any-
thing that Congress may do within the limits of the com-
merce clause for the betterment of business [could] be
done by the President . . . by calling it a code.  This is
delegation running riot."[48]

The same year, in *Panama Refining Co.* v. *Ryan*, the
Court struck down a statute that authorized the President
to decide whether and how to prohibit the interstate
transportation of "'hot oil,'" petroleum produced or with-
drawn from storage in excess of state-set quotas.  As in
*Schechter Poultry*, the law provided no notice to regulated
parties about what the President might wind up prohibit-
ing, leading the Court to observe that Congress "ha[d]
declared no policy, ha[d] established no standard, ha[d]
laid down no rule."[49]  The Court explained that the statute
did not call for the executive to "ascertai[n] the existence
of facts to which legislation is directed."[50]  Nor did it ask
the executive to "'fill up the details'" "within the frame-
work of the policy which the legislature has sufficiently
defined."[51]  "If [the statute] were held valid," the Court
continued, "it would be idle to pretend that anything
would be left of limitations upon the power of the Congress

––––––––

[47] See A. Shlaes, The Forgotten Man: A New History of the Great
Depression 214–225 (2007).

[48] *Schechter Poultry*, 295 U. S., at 553 (concurring opinion).

[49] *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 415, 418, 430 (1935).

[50] *Id.*, at 426.

[51] *Id.*, at 426 (quoting *Wayman*, 10 Wheat., at 43); 293 U. S., at 429.

to delegate its law-making function."[52]

After *Schechter Poultry* and *Panama Refining*, Congress responded by writing a second wave of New Deal legislation more "[c]arefully crafted" to avoid the kind of problems that sank these early statutes.[53]  And since that time the Court hasn't held another statute to violate the separation of powers in the same way.  Of course, no one thinks that the Court's quiescence can be attributed to an unwavering new tradition of more scrupulously drawn statutes.  Some lament that the real cause may have to do with a mistaken "case of death by association" because *Schechter Poultry* and *Panama Refining* happened to be handed down during the same era as certain of the Court's now-discredited substantive due process decisions.[54]  But maybe the most likely explanation of all lies in the story of the evolving "intelligible principle" doctrine.

This Court first used that phrase in 1928 in *J. W. Hampton, Jr., & Co.* v. *United States*, where it remarked that a statute "lay[ing] down by legislative act an intelligible principle to which the [executive official] is directed to conform" satisfies the separation of powers.[55]  No one at the time thought the phrase meant to effect some revolution in this Court's understanding of the Constitution.  While the exact line between policy and details, lawmaking and fact-finding, and legislative and non-legislative functions had sometimes invited reasonable debate, everyone agreed these were the relevant inquiries.  And when Chief Justice Taft wrote of an "intelligible principle," it seems plain enough that he sought only to explain the

_____

[52] *Id.*, at 430.

[53] M. McKenna, Franklin Roosevelt and the Great Constitutional War: The Court-Packing Crisis of 1937, p. 424 (2002).

[54] J. Ely, Democracy and Distrust: A Theory of Judicial Review 133 (1980).

[55] 276 U. S. 394, 409 (1928).

operation of these traditional tests; he gave no hint of a wish to overrule or revise them. Tellingly, too, he wrote the phrase seven years before *Schechter Poultry* and *Panama Refining*, and it did nothing to alter the analysis in those cases, let alone prevent those challenges from succeeding by lopsided votes.

There's a good argument, as well, that the statute in *J. W. Hampton* passed muster under the traditional tests. To boost American competitiveness in international trade, the legislation directed the President to "'investigat[e]'" the relative costs of production for American companies and their foreign counterparts and impose tariffs or duties that would "'equalize'" those costs.[56] It also offered guidance on how to determine costs of production, listing several relevant factors and establishing a process for interested parties to submit evidence.[57] The President's fact-finding responsibility may have required intricate calculations, but it could be argued that Congress had made all the relevant policy decisions, and the Court's reference to an "intelligible principle" was just another way to describe the traditional rule that Congress may leave the executive the responsibility to find facts and fill up details.[58]

Still, it's undeniable that the "intelligible principle" remark eventually began to take on a life of its own. We sometimes chide people for treating judicial opinions as if they were statutes, divorcing a passing comment from its context, ignoring all that came before and after, and treating an isolated phrase as if it were controlling.[59] But that seems to be exactly what happened here. For two decades,

---

[56] *Id.*, at 401.

[57] *Id.*, at 401–402.

[58] But see *Department of Transportation* v. *Association of American Railroads*, 575 U. S. 43, ___, ___, and n. 4 (2015) (THOMAS, J., concurring in judgment) (slip op., at 14, 17, and n. 4).

[59] See, *e.g.*, *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 341 (1979).

no one thought to invoke the "intelligible principle" comment as a basis to uphold a statute that would have failed more traditional separation-of-powers tests. In fact, the phrase sat more or less silently entombed until the late 1940s. Only then did lawyers begin digging it up in earnest and arguing to this Court that it had somehow displaced (*sub silentio* of course) all prior teachings in this area.[60]

This mutated version of the "intelligible principle" remark has no basis in the original meaning of the Constitution, in history, or even in the decision from which it was plucked. Judges and scholars representing a wide and diverse range of views have condemned it as resting on "misunderst[ood] historical foundations."[61] They have explained, too, that it has been abused to permit delegations of legislative power that on any other conceivable account should be held unconstitutional. Indeed, where some have claimed to see "intelligible principles" many "less discerning readers [have been able only to] find gibberish."[62] Even Justice Douglas, one of the fathers of

————————

[60] See, *e.g.*, *Lichter* v. *United States*, 334 U. S. 742, 785 (1948) (upholding a statute authorizing the executive to define "'excessive profits'" earned by military contractors on the basis that the statute contained an "'intelligible principle'").

[61] *Association of American Railroads*, 575 U. S., at \_\_\_ (THOMAS, J., concurring in judgment) (slip op., at 17). See also n. 62, *infra* (collecting sources).

[62] Lawson, 88 Va. L. Rev., at 329. See also *Mistretta* v. *United States*, 488 U. S. 361, 415–417 (1989) (Scalia, J., dissenting); Ely, *supra*, at 132 ("[B]y refusing to legislate, our legislators are escaping the sort of accountability that is crucial to the intelligible functioning of a democratic republic"); Wright, Beyond Discretionary Justice, 81 Yale L. J. 575, 583 (1972) ("[T]he delegation doctrine retains an important potential as a check on the exercise of unbounded, standardless discretion by administrative agencies"); *Michigan Gambling Opposition* v. *Kempthorne*, 525 F. 3d 23, 34 (CADC 2008) (Brown, J., dissenting) ("[The majority] conjures standards and limits from thin air to con-

the administrative state, came to criticize excessive con-
gressional delegations in the period when the intelligible
principle "test" began to take hold.[63]

Still, the scope of the problem can be overstated. At
least some of the results the Court has reached under the
banner of the abused "intelligible principle" doctrine may
be consistent with more traditional teachings. Some
delegations have, at least arguably, implicated the presi-
dent's inherent Article II authority. The Court has held,
for example, that Congress may authorize the President to
prescribe aggravating factors that permit a military court-
martial to impose the death penalty on a member of the
Armed Forces convicted of murder—a decision that may

—————

struct a supposed intelligible principle") (collecting cases); Schoenbrod,
83 Mich. L. Rev., at 1231 ("[T]he [intelligible principle] test has become
so ephemeral and elastic as to lose its meaning"); Schwartz, Of Admin-
istrators and Philosopher-Kings: The Republic, the Laws, and Delega-
tions of Power, 72 Nw. U. L. Rev. 443, 446 (1977) ("[T]he requirement of
defined standards has . . . become all but a vestigial euphemism"); P.
Hamburger, Is Administrative Law Unlawful? 378 (2014) ("[T]he notion
of an 'intelligible principle' sets a ludicrously low standard for what
Congress must supply"); M. Redish, The Constitution as Political
Structure 138–139 (1995); Gewirtz, The Courts, Congress, and Execu-
tive Policy-Making: Notes on Three Doctrines, 40 Law & Contemp.
Prob., pt. 2, pp. 46, 50–51 (Summer 1976); McGowan, Congress, Court,
and Control of Delegated Power, 77 Colum. L. Rev. 1119, 1127–1128,
and n. 33 (1977).

[63] "Washington, D. C., is filled with lobbyists for every special interest
that is trying to make a fast buck out of some piece of the public do-
main. . . . In the thirties and forties I had viewed the creation of an
agency as the solution of a problem. I learned that agencies soon
became spokesmen for the status quo, that few had the guts to carry
through the reforms assigned to them. I also realized that Congress
defaulted when it left it up to an agency to do what the 'public interest'
indicated should be done. 'Public interest' is too vague a standard to be
left to free-wheeling administrators. They should be more closely
confined to specific ends or goals." W. Douglas, Go East, Young Man
216–217 (1974).

implicate in part the President's independent commander-in-chief authority.[64]   Others of these cases may have involved laws that specified rules governing private conduct but conditioned the application of those rules on fact-finding—a practice that is, as we've seen, also long associated with the executive function.[65]

More recently, too, we've sought to tame misunderstandings of the intelligible principle "test."  In *Touby* v. *United States*, the Court considered a provision of the Controlled Substances Act that allowed the Attorney General to add a substance to a list of prohibited drugs temporarily if he determined that doing so was "'necessary to avoid an imminent hazard to the public safety.'"[66]  Notably, Congress required the Attorney General, before acting, to consider the drug's "'history and current pattern of abuse,'" the "'scope, duration, and significance of [that] abuse,'" and "'[w]hat, if any, risk there is to the public health.'"[67]  In approving the statute, the Court stressed all these constraints on the Attorney General's discretion and, in doing so, seemed to indicate that the statute supplied an "intelligible principle" *because* it assigned an essentially fact-finding responsibility to the executive. Whether or not one agrees with its characterization of the statute, in proceeding as it did *Touby* may have at least begun to point us back in the direction of the right questions.  To determine whether a statute provides an intelli-

––––––––––

[64] *Loving*, 517 U. S., at 771–774.

[65] See, *e.g.*, *Skinner* v. *Mid-America Pipeline Co.*, 490 U. S. 212, 215, 219–220 (1989) (statute directing Secretary of Transportation to establish pipeline safety user fees "'sufficient to meet the costs of [specified] activities'" but not "'exceed[ing] 105 percent of the aggregate of appropriations made for such fiscal year for activities to be funded by such fees'").

[66] 500 U. S. 160, 166 (1991).

[67] *Ibid.*

gible principle, we must ask: Does the statute assign to the executive only the responsibility to make factual findings? Does it set forth the facts that the executive must consider and the criteria against which to measure them? And most importantly, did Congress, and not the Executive Branch, make the policy judgments? Only then can we fairly say that a statute contains the kind of intelligible principle the Constitution demands.

While it's been some time since the Court last held that a statute improperly delegated the legislative power to another branch—thanks in no small measure to the intelligible principle misadventure—the Court has hardly abandoned the business of policing improper legislative delegations. When one legal doctrine becomes unavailable to do its intended work, the hydraulic pressures of our constitutional system sometimes shift the responsibility to different doctrines.[68] And that's exactly what's happened here. We still regularly rein in Congress's efforts to delegate legislative power; we just call what we're doing by different names.

Consider, for example, the "major questions" doctrine. Under our precedents, an agency can fill in statutory gaps where "statutory circumstances" indicate that Congress meant to grant it such powers.[69] But we don't follow that rule when the "statutory gap" concerns "a question of deep 'economic and political significance' that is central to the statutory scheme."[70] So we've rejected agency demands that we defer to their attempts to rewrite rules for billions of dollars in healthcare tax credits,[71] to assume control

---

[68] See, *e.g.*, *McDonald* v. *Chicago*, 561 U. S. 742, 758 (2010) (incorporating the Second Amendment through the Due Process Clause instead of the Privileges or Immunities Clause).

[69] *United States* v. *Mead Corp.*, 533 U. S. 218, 229 (2001).

[70] *King* v. *Burwell*, 576 U. S. ___, ___ (2015) (slip op., at 8).

[71] *Ibid.*

over millions of small greenhouse gas sources,[72] and to ban cigarettes.[73] Although it is nominally a canon of statutory construction, we apply the major questions doctrine in service of the constitutional rule that Congress may not divest itself of its legislative power by transferring that power to an executive agency.

Consider, too, this Court's cases addressing vagueness. "A vague law," this Court has observed, "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis."[74] And we have explained that our doctrine prohibiting vague laws is an outgrowth and "corollary of the separation of powers."[75] It's easy to see, too, how most any challenge to a legislative delegation can be reframed as a vagueness complaint: A statute that does not contain "sufficiently definite and precise" standards "to enable Congress, the courts, and the public to ascertain" whether Congress's guidance has been followed at once presents a delegation problem and provides impermissibly vague guidance to affected citizens.[76] And it seems little coincidence that our void-for-vagueness cases became much more common soon after the Court began relaxing its approach to legislative delegations. Before 1940, the Court decided only a handful of vagueness challenges to federal statutes. Since then, the phrase "void for vagueness" has appeared in our cases well over 100 times.

-------

[72] *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 324 (2014).

[73] *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 159–160 (2000).

[74] *Grayned* v. *City of Rockford*, 408 U. S. 104, 108–109 (1972); see *Kolender* v. *Lawson*, 461 U. S. 352, 358, n. 7 (1983); *Sessions* v. *Dimaya*, 584 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (GORSUCH, J., concurring in part and concurring in judgment) (slip op., at 7–9).

[75] *Id.*, at \_\_\_–\_\_\_ (opinion of KAGAN, J.) (slip op., at 4–5).

[76] *Yakus*, 321 U. S., at 426.

Nor have we abandoned enforcing other sides of the separation-of-powers triangle between the legislative, executive, and judiciary. We have not hesitated to prevent Congress from "confer[ring] the Government's 'judicial Power' on entities outside Article III."[77] We've forbidden the executive from encroaching on legislative functions by wielding a line-item veto.[78] We've prevented Congress from delegating its collective legislative power to a single House.[79] And we've policed legislative efforts to control executive branch officials.[80] These cases show that, when the separation of powers is at stake, we don't just throw up our hands. In all these areas, we recognize that abdication is "not part of the constitutional design."[81] And abdication here would be no more appropriate. To leave this aspect of the constitutional structure alone undefended would serve only to accelerate the flight of power from the legislative to the executive branch, turning the latter into a vortex of authority that was constitutionally reserved for the people's representatives in order to protect their liberties.

### III
### A

Returning to SORNA with this understanding of our charge in hand, problems quickly emerge. Start with this one: It's hard to see how SORNA leaves the Attorney General with only details to fill up. Of course, what qualifies as a detail can sometimes be difficult to discern and,

---

[77] *Stern* v. *Marshall*, 564 U. S. 462, 484 (2011); *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 225–226 (1995).

[78] *Clinton* v. *City of New York*, 524 U. S. 417, 449 (1998).

[79] *INS* v. *Chadha*, 462 U. S. 919 (1983).

[80] *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 496–497 (2010); *Lucia* v. *SEC*, 585 U. S. ___ (2018).

[81] *Clinton*, 524 U. S., at 452 (Kennedy, J., concurring).

as we've seen, this Court has upheld statutes that allow federal agencies to resolve even highly consequential details so long as Congress prescribes the rule governing private conduct. But it's hard to see how the statute before us could be described as leaving the Attorney General with only details to dispatch. As the government itself admitted in *Reynolds*, SORNA leaves the Attorney General free to impose on 500,000 pre-Act offenders all of the statute's requirements, some of them, or none of them. The Attorney General may choose which pre-Act offenders to subject to the Act. And he is free to change his mind at any point or over the course of different political administrations. In the end, there isn't a single policy decision concerning pre-Act offenders on which Congress even tried to speak, and not a single other case where we have upheld executive authority over matters like these on the ground they constitute mere "details." This much appears to have been deliberate, too. Because members of Congress could not reach consensus on the treatment of pre-Act offenders, it seems this was one of those situations where they found it expedient to hand off the job to the executive and direct there the blame for any later problems that might emerge.

Nor can SORNA be described as an example of conditional legislation subject to executive fact-finding. To be sure, Congress could have easily written this law in that way. It might have required all pre-Act offenders to register, but then given the Attorney General the authority to make case-by-case exceptions for offenders who do not present an "'imminent hazard to the public safety'" comparable to that posed by newly released post-Act offenders.[82] It could have set criteria to inform that determination, too, asking the executive to investigate, say, whether

---

[82] Cf. *Touby*, 500 U. S., at 166.

an offender's risk of recidivism correlates with the time since his last offense, or whether multiple lesser offenses indicate higher or lower risks than a single greater offense.

But SORNA did none of this. Instead, it gave the Attorney General unfettered discretion to decide which requirements to impose on which pre-Act offenders. The Attorney General's own edicts acknowledge the considerable policy-making powers he enjoys, describing his rules governing pre-Act offenders as "'of fundamental importance to the initial operation of SORNA, and to its practical scope . . . since [they] determin[e] the applicability of SORNA's requirements to virtually the entire existing sex offender population.'"[83] These edicts tout, too, the Attorney General's "discretion to apply SORNA's requirements to sex offenders with pre-SORNA convictions if he determines (as he has) that the public benefits of doing so outweigh any adverse effects."[84] Far from deciding the factual predicates to a rule set forth by statute, the Attorney General himself acknowledges that the law entitles him to make his own policy decisions.

Finally, SORNA does not involve an area of overlapping authority with the executive. Congress may assign the President broad authority regarding the conduct of foreign affairs or other matters where he enjoys his own inherent Article II powers. But SORNA stands far afield from any of that. It gives the Attorney General the authority to "prescrib[e] the rules by which the duties and rights" of citizens are determined, a quintessentially legislative power.[85]

Our precedents confirm these conclusions. If allowing

---

[83] 75 Fed. Reg. 81850 (quoting 72 Fed. Reg. 8896).
[84] 75 Fed. Reg. 81850.
[85] The Federalist No. 78, at 465 (Hamilton); see also Part II–A, *supra.*

the President to draft a "cod[e] of fair competition" for slaughterhouses was "delegation running riot," then it's hard to see how giving the nation's chief prosecutor the power to write a criminal code rife with his own policy choices might be permissible.[86]  And if Congress may not give the President the discretion to ban or allow the interstate transportation of petroleum, then it's hard to see how Congress may give the Attorney General the discretion to apply or not apply any or all of SORNA's requirements to pre-Act offenders, and then change his mind at any time.[87]  If the separation of powers means anything, it must mean that Congress cannot give the executive branch a blank check to write a code of conduct governing private conduct for a half-million people.

The statute here also sounds all the alarms the founders left for us.  Because Congress could not achieve the consensus necessary to resolve the hard problems associated with SORNA's application to pre-Act offenders, it passed the potato to the Attorney General.  And freed from the need to assemble a broad supermajority for his views, the Attorney General did not hesitate to apply the statute retroactively to a politically unpopular minority.  Nor could the Attorney General afford the issue the kind of deliberative care the framers designed a representative legislature to ensure.  Perhaps that's part of the reason why the executive branch found itself rapidly adopting different positions across different administrations.  And because SORNA vested lawmaking power in one person rather than many, it should be no surprise that, rather than few and stable, the edicts have proved frequent and shifting, with fair notice sacrificed in the process.  Then, too, there is the question of accountability.  In passing this

---

[86] *Schechter Poultry*, 295 U. S., at 552–553 (Cardozo, J., concurring).
[87] *Panama Refining*, 293 U. S., at 430.

statute, Congress was able to claim credit for "comprehensively" addressing the problem of the entire existing population of sex offenders (who can object to that?), while in fact leaving the Attorney General to sort it out.

It would be easy enough to let this case go. After all, sex offenders are one of the most disfavored groups in our society. But the rule that prevents Congress from giving the executive *carte blanche* to write laws for sex offenders is the same rule that protects everyone else. Nor is it hard to imagine how the power at issue in this case—the power of a prosecutor to require a group to register with the government on pain of weighty criminal penalties—could be abused in other settings. To allow the nation's chief law enforcement officer to write the criminal laws he is charged with enforcing—to "'unit[e]'" the "'legislative and executive powers . . . in the same person'"—would be to mark the end of any meaningful enforcement of our separation of powers and invite the tyranny of the majority that follows when lawmaking and law enforcement responsibilities are united in the same hands.[88]

Nor would enforcing the Constitution's demands spell doom for what some call the "administrative state." The separation of powers does not prohibit any particular policy outcome, let alone dictate any conclusion about the proper size and scope of government. Instead, it is a procedural guarantee that requires Congress to assemble a social consensus before choosing our nation's course on policy questions like those implicated by SORNA. What is more, Congress is hardly bereft of options to accomplish all it might wish to achieve. It may always authorize executive branch officials to fill in even a large number of details, to find facts that trigger the generally applicable rule of conduct specified in a statute, or to exercise non-

---

[88] The Federalist No. 47, at 302.

legislative powers.  Congress can also commission agencies or other experts to study and recommend legislative language.  Respecting the separation of powers forecloses no substantive outcomes.  It only requires us to respect along the way one of the most vital of the procedural protections of individual liberty found in our Constitution.

B

What do the government and the plurality have to say about the constitutional concerns SORNA poses?  Most everyone, the plurality included, concedes that if SORNA allows the Attorney General as much authority as we have outlined, it would present "a nondelegation question."[89]  So the only remaining available tactic is to try to make this big case "small-bore"[90] by recasting the statute in a way that might satisfy any plausible separation-of-powers test.  So, yes, just a few years ago in *Reynolds* the government represented to this Court that SORNA granted the Attorney General nearly boundless discretion with respect to pre-Act offenders.  But *now*, faced with a constitutional challenge, the government speaks out of the other side of its mouth and invites us to reimagine SORNA as compelling the Attorney General to register pre-Act offenders "to the maximum extent feasible."  And, as thus reinvented, the government insists, the statute supplies a clear statement of legislative policy, with only details for the Attorney General to clean up.

But even this new dream of a statute wouldn't be free from doubt.  A statute directing an agency to regulate private conduct to the extent "feasible" can have many possible meanings: It might refer to "technological" feasibility, "economic" feasibility, "administrative" feasibility,

---

[89] *Ante*, at 6.
[90] *Ante,* at 17.

or even "political" feasibility. Such an "evasive standard" could threaten the separation of powers if it effectively allowed the agency to make the "important policy choices" that belong to Congress while frustrating "meaningful judicial review."[91] And that seems exactly the case here, where the Attorney General is left free to make all the important policy decisions and it is difficult to see what standard a court might later use to judge whether he exceeded the bounds of the authority given to him.

But don't worry over that; return to the real world. The bigger problem is that the feasibility standard is a figment of the government's (very recent) imagination. The only provision addressing pre-Act offenders, §20913(d), says *nothing* about feasibility. And the omission can hardly be excused as some oversight: No one doubts that Congress knows exactly how to write a feasibility standard into law when it wishes.[92] Unsurprisingly, too, the existence of some imaginary statutory feasibility standard seemed to have escaped notice at the Department of Justice during the Attorney General's many rulemakings; in those proceedings, as we have seen, the Attorney General has repeatedly admitted that the statute affords him the authority to "balance" the burdens on sex offenders with "public safety interests" as and how he sees fit.[93]

Unable to muster a feasibility standard from the only statutory provision addressing pre-Act offenders, the plurality invites us to hunt in other and more unlikely corners. It points first to SORNA's "[d]eclaration of purpose," which announces that Congress, "[i]n order to pro-

---

[91] *Industrial Union Dept., AFL–CIO* v. *American Petroleum Institute*, 448 U. S. 607, 676, 685–686 (1980) (Rehnquist, J., concurring in judgment).

[92] See, *e.g.*, 42 U. S. C. §§1310(b)(2)(C), 1383b(e)(2)(B); 20 U. S. C. §3509; 49 U. S. C. §24201(a)(1).

[93] 75 Fed. Reg. 81851–81852.

tect the public from sex offenders and offenders against children . . . establishes a comprehensive national system for the registration of those offenders."[94]  But nowhere is feasibility mentioned here either.  In fact, this provision doesn't purport to guide the Attorney General's discretion at all.  Instead, it simply declares what Congress believed the *rest* of the statute's enacted provisions had already "establishe[d]," without the need for any action by the Attorney General.  And by now surely we must all agree that broad and sweeping statements like these about "a statute's 'basic purpose' are . . . inadequate to overcome the words of its text regarding the specific issue under consideration."[95]  While those adopting SORNA might have declared that they hoped and wished for a "comprehensive national system," the fact remains that the law they actually adopted for pre-Act offenders leaves everything to the Attorney General.  Hopes and dreams are not laws.

Besides, even if we were to pretend that §20901 amounted to a directive *telling* the Attorney General to establish a "comprehensive national system" for pre-Act offenders, the plurality reads too much into the word "comprehensive."  Comprehensive coverage does not mean coverage to the maximum extent feasible.  "Comprehensive" means "having the attribute of comprising or including much; of large content or scope," "[i]nclusive of; embracing," or "[c]ontaining much in small compass; compendious."[96]  So, for example, a criminal justice system may be called "comprehensive" even though many crimes go unpursued.  And SORNA itself contains all sorts of

---

[94] 34 U. S. C. §20901.  See also *ante*, at 11–12.

[95] *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 261 (1993) (emphasis deleted).

[96] 3 Oxford English Dictionary 632 (2d ed. 1989).

coverage exceptions for *post-Act* offenders yet claims to comprehensively address them.[97]   In the same way, no reason exists why SORNA might not also claim to address pre-Act offenders "comprehensively" even though the Attorney General is free to exercise his discretion to forgo registration for some, many, or maybe all of them.  The statute still "comprehensively" addresses these persons by indicating they must abide whatever rules an Attorney General may choose.  In all these ways, SORNA might be said to address sex offenders past, present, and future in a way that "compris[es] or includ[es] much," and that is "of large content or scope," but in a way that nevertheless delegates important policy decisions to the executive branch.

Finding it impossible to conscript the statute's declaration of purpose into doing the work it needs done, the government and plurality next ask us to turn to SORNA's definition of "'sex offender.'"[98]   They emphasize that SORNA defines a "sex offender" as "'an individual who *was* convicted of a sex offense'"—and, they note, pre-Act offenders meet this definition.[99]  Because pre-Act offenders fall within the definition of "sex offender[s]," the government and plurality continue, it follows that the Attorney General must ensure all of them are registered and subject to SORNA's demands.

That much, however, does not follow.  To say that pre-Act sex offenders fall within the definition of "sex offenders" is merely a truism: Yes, of course, these people have already been convicted of sex offenses under state law.  But whether these individuals are *also* subject to federal registration requirements is a different question entirely.

---

[97] See, *e.g.*, 34 U. S. C. §§20911(7)(A)–(B), (8), 20915(a), (b)(1).
[98] *Ante*, at 12–13.
[99] *Ibid.*

And as we have seen, the only part of the statute that speaks to pre-Act sex offenders—§20913(d)—makes plain that they are *not* automatically subject to all the Act's terms but are left to their fate at the hands of the Attorney General. Look at it this way: If the statute's definitional section were really enough to command the registration of all sex offenders, the Act would have had no need to proceed to explain, as it does at great length, when *post*-Act sex offenders must register and when they need not.

If that argument won't work, the plurality points us to §20913(d)'s second clause, which grants the Attorney General the authority "to prescribe rules for the registration of . . . sex offenders . . . who are unable to comply" with the Act's initial registration requirements.[100] According to the plurality, this language suggests that Congress expected the Attorney General to register pre-Act offenders to the maximum extent feasible. But, of course, this clause, too, says nothing of the sort. And the authority provided under §20913(d)'s *first* clause—which gives the Attorney General the blanket authority "to specify the applicability of the requirements of this subchapter"—is *additional to* the authority granted under the *second* clause. So not only does the Attorney General have the authority to prescribe rules for the registration of pre-Act offenders under the second clause, he is free to specify which statutory requirements he does and does not wish to apply under the first clause. Far from suggesting a maximalist approach then, the second clause read in light of the first only serves to underscore the breadth of the Attorney General's discretion.

With so little in statutory text to work with, the government and the plurality "can't resist" highlighting cer-

---

[100] *Ante*, at 14.

tain statements from the Act's legislative history.[101]  But "legislative history is not the law."[102]  Still less can committee reports or statements by individual legislators be used "to muddy clear statutory language" like that before us.[103]  And even taken on their own terms, these statements do no more than confirm that some members of Congress hoped and wished that the Attorney General would exercise his discretion to register at least some pre-Act offenders.  None of these snippets mentions a "feasibility" standard, and none can obscure the absence of such a standard in the law itself.

That leaves the plurality and the government to try to fish its feasibility standard from our decision in *Reynolds*.  But *Reynolds* would make a difference only if it bound us as a matter of *stare decisis* to adopt an interpretation inconsistent with the statute's terms.  And, of course, it does no such thing.  The government and the plurality submit that *Reynolds* was premised on an understanding that Congress intended the statute to apply to pre-Act offenders to the maximum extent feasible.  To support their reading they point to *Reynolds'* surmise that Congress "may well have thought [that there could be] practical problems" with applying SORNA to pre-Act offenders and for that reason left their registration obligations to be sorted out by the Attorney General.[104]  But speculation about some of Congress's motives in adopting §20913(d) aside, *Reynolds* plainly understood the statute itself as investing the Attorney General with sole power to decide whether and when to apply SORNA's requirements to pre-

---

[101] See *ante*, at 13–14.

[102] *Epic Systems Corp.* v. *Lewis*, 584 U. S. ___, ___ (2018) (slip op., at 23).

[103] *Milner* v. *Department of Navy*, 562 U. S. 562, 572 (2011).

[104] *Reynolds*, 565 U. S., at 440–441.

Act offenders.[105]

\*

Nothing found here can come as a surprise. In *Reynolds*, the government told this Court that SORNA supplies no standards regulating the Attorney General's treatment of pre-Act offenders. This Court agreed, and everyone proceeded with eyes open about the potential constitutional consequences; in fact, the dissent expressly warned that adopting such a broad construction of the statute would yield the separation-of-powers challenge we face today.[106] Now, when the statute faces the chopping block, the government asks us to ignore its earlier arguments and reimagine (really, rewrite) the statute in a new and narrower way to avoid its long-predicted fate. No wonder some of us are not inclined to play along.

The only real surprise is that the Court fails to make good on the consequences the government invited, resolving nothing and deferring everything. In a future case with a full panel, I remain hopeful that the Court may yet recognize that, while Congress can enlist considerable assistance from the executive branch in filling up details and finding facts, it may never hand off to the nation's chief prosecutor the power to write his own criminal code. That "is delegation running riot."[107]

––––––––––

[105] *Id.*, at 445 (holding that "the Act's registration requirements do not apply to pre-Act offenders until the Attorney General so specifies"); *id.*, at 439 (rejecting argument that any SORNA requirements apply to pre-Act offenders "before the Attorney General validly specifies" they do); *id.*, at 440–441 (observing that the Attorney General might conclude that "different federal registration treatment of different categories of pre-Act offenders" is "warranted").

[106] See *id.*, at 450 (Scalia, J., dissenting).

[107] *Schechter Poultry*, 295 U. S., at 553 (Cardozo, J., concurring).