# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40000**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Jayson D. ANDERSEN**
Major (O-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 19 April 2022

————————————

*Military Judge:* Bryon T. Gleisner.

*Sentence:* Sentence adjudged on 24 September 2020 by GCM convened at Wright-Patterson Air Force Base, Ohio. Sentence entered by military judge on 16 October 2020: Dismissal, confinement for 63 months, and a reprimand.

*For Appellant:* Major Benjamin H. DeYoung, USAF; Major Eshawn R. Rawlley, USAF.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Allison R. Gish, USAF; Mary Ellen Payne, Esquire.

Before KEY, ANNEXSTAD, and MEGINLEY *Appellate Military Judges*.

Senior Judge KEY delivered the opinion of the court, in which Judge ANNEXSTAD and Judge MEGINLEY joined.

————————————

**PUBLISHED OPINION OF THE COURT**

————————————

KEY, Senior Judge:

A military judge sitting as a general court-martial convicted Appellant, in accordance with his pleas and pursuant to a plea agreement, of one specification each of attempted indecent visual recording, indecent visual recording,

obstruction of justice, and viewing of child pornography. These specifications respectively alleged violations of Articles 80, 120c, 131b, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 920c, 931b, 934.[1] The military judge sentenced Appellant to a dismissal, confinement for 63 months, and a reprimand.

Appellant raises three assignments of error: (1) whether the military judge erred by permitting a victim to deliver an unsworn impact statement via a pre-recorded video; (2) whether the President exceeded his authority by not requiring a written staff judge advocate recommendation in cases such as Appellant's; and (3) whether Congress unconstitutionally delegated its authority to the President by permitting the President to determine "to what extent" provisions of the UCMJ would apply in certain cases. We find no error materially prejudicial to Appellant's substantial rights and affirm the findings and sentence.

# I. BACKGROUND

In May 2019, Appellant attempted to use his mobile phone to record 11-year-old EK as she tried on a swimsuit at a clothing store while her stepmother continued shopping elsewhere in the store. Appellant—who had no relationship with EK—did so by sliding his phone under the curtain in the fitting room EK was using; she saw the phone and twice kicked it away. EK told her stepmother what had happened after she left the fitting room. The local police posted still images from the store's security camera system on social media, and Appellant was arrested after being identified as the perpetrator. Appellant was released on bail, and in the ensuing investigation he confessed to not only trying to record EK but to making approximately 50 surreptitious recordings of other people in a similar manner.[2] Appellant also confessed to storing the recordings on a digital device, which he destroyed after he was first arrested out of concern that the recordings would be found by law enforcement. Additionally, analysis of Appellant's phone uncovered evidence Appellant had used it to view child pornography.

---

[1] The Article 120c and 134, UCMJ, specifications allege offenses occurring over date ranges which spanned 1 January 2019—specifically from 2017 through mid-2019; as a result, references to those punitive articles are to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise specified, all other references to the UCMJ and the Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] During his providence inquiry, Appellant told the military judge that between 20 and 25 of these recordings were "successful" in capturing the subjects' private areas.

## II. DISCUSSION

### A. EK's Recorded Statement

#### 1. Additional Background

After the Government rested during presentencing proceedings, trial counsel provided the military judge with what she described as a ten-minute video recording of EK's "impact statement." Trial counsel explained that EK's mother was not feeling well and that "it would be less stressful" if she and EK did not come to the court-martial. Trial counsel added that EK had originally planned to attend, but EK "was okay using the tape instead." The military judge had the video marked as a court exhibit and asked if the Defense had any objection to it. In response, trial defense counsel asked for a brief recess so they could consider whether or not to object. The military judge granted that request, and when the court-martial reconvened, he again asked whether the Defense objected, to which trial defense counsel replied, "No, Your Honor." The parties then discussed whether the video would be played in open court or if the military judge would watch the video in his chambers; during that discussion, trial defense counsel acknowledged they had previously seen the video. In line with the Defense's position, the video was played in open court.

In the video, EK recounts her experience in the fitting room and how she tried "stomping" on Appellant's phone in the hopes that she could grab it, but Appellant would not let go. She also explains how she has become less trusting, more fearful, and more protective of her siblings since the incident, and that she thinks about the episode daily. During the video, an unidentified off-camera male periodically guides EK (for example, the male asks EK how often she thinks about the episode and whether it has impacted anything she does from day to day), but the male never provides any substantive commentary. At no point during Appellant's court-martial did the Defense object to any aspect of the video.

#### 2. Law and Analysis

Appellant argues the military judge erred by admitting EK's pre-recorded statement. His theory is that Rule for Courts-Martial (R.C.M.) 1001(c) only permits victim unsworn statements to be presented orally "in the presence of the factfinder," in written form, or both. He further argues the male voice in the video likely belongs to trial counsel, and that the Government co-opted EK's rights in an effort to seek a higher sentence by assisting in—if not wholly directing—the video. Appellant, however, has waived this issue.

When an appellant merely fails to object to the admission of evidence at trial, the issue is forfeited; but when an appellant affirmatively states he has no objection to the admission of evidence, the issue is waived and his right to complain on appeal is extinguished. *United States v. Davis*, 79 M.J. 329, 331

(C.A.A.F. 2020); *United States v. Ahern*, 76 M.J. 194, 198 (C.A.A.F. 2017) (citing *United States v. Campos*, 67 M.J. 330, 332–33 (C.A.A.F. 2009)). Here, trial defense counsel had seen the video and stated they had no objection to it even after taking a short break to consider whether to object. Thus, trial defense counsel did not merely fail to object at trial, they made the deliberate choice not to do so and thereby affirmatively waived the matter by stating they had no objection.

Pursuant to Article 66(d), UCMJ, we have the unique statutory responsibility to affirm only such findings of guilty and so much of the sentence that is correct and "should be approved." 10 U.S.C. § 866(d). As a result, we retain the authority to address errors raised for the first time on appeal despite waiver of those errors at trial. *See, e.g.*, *United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018). Having carefully considered Appellant's alleged error and specifically noting Appellant does not allege any error with the substance of EK's comments in the video, we have determined we will leave his waiver intact.

Even if we were to conclude Appellant had forfeited, rather than waived, this issue, we would conclude any error was harmless under the facts presented here. A victim's right to be heard through an unsworn statement belongs solely to the victim or that victim's designee. *United States v. Barker*, 77 M.J. 377, 378 (C.A.A.F. 2018). The comments made by the unidentified male in the video were not EK's own statements, but they were largely inconsequential in the context of the video as a whole, as the comments served to do little more than orient EK to the general topics she discussed. There was no evidence trial counsel played any role in producing the video, and the video lacked the obvious incorporation of any message from anyone other than EK—oral or otherwise. Moreover, the video is a single-take recording of EK sitting at a desk and speaking directly to the camera; it is devoid of any music, photographs, or other production elements calculated to evoke an emotional response. *See United States v. Edwards*, __ M.J. __, No. 21-0245, 2022 CAAF LEXIS 283, *23–24 (C.A.A.F. 14 Apr. 2022) (concluding the appellant was prejudiced by allowing video of victim unsworn statement which trial counsel had produced and which included music and photographs). Finally, trial counsel did not seek to capitalize on the video during the Government's sentencing argument and instead only briefly referred to EK's comments about being afraid when older men look at her and not letting her siblings play near windows. Therefore, to the extent the military judge committed plain error by permitting EK to be heard via a recorded video statement in which someone else periodically asks questions, the error was harmless in this case.

## B. The Absence of a Staff Judge Advocate Recommendation

There is no written staff judge advocate recommendation in Appellant's record of trial. Appellant contends the President exceeded his authority by not

requiring such a recommendation in cases like Appellant's, where at least one offense is charged as occurring prior to 1 January 2019—the effective date of the Military Justice Act of 2016 (MJA).[3]

### 1. Additional Background and Law

We review the question of proper completion of post-trial processing de novo as a question of law. *United States v. Zegarrundo*, 77 M.J. 612, 614 (A.F. Ct. Crim. App. 2018) (citing *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000)). In order to resolve this issue, we must first consider the enactment and implementation of the MJA and its impacts on post-trial processing.

Prior to the MJA, Article 60, UCMJ, required convening authorities to take action on every court-martial sentence—that is, the convening authority was required to approve, disapprove, commute, or suspend the sentence in whole or in part. Article 60(c)(2), UCMJ, 10 U.S.C. § 860(c)(2) (*Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*)). A different provision in the same article required convening authorities to "obtain and consider the written recommendation of his staff judge advocate or legal officer" prior to taking action. Article 60(e), UCMJ, 10 U.S.C. § 860(e) (2016 *MCM*). The MJA, however, transformed the convening authority's post-trial responsibility to take action from a mandatory act into a discretionary one and dispensed altogether with the requirement to obtain a written legal recommendation. National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, §§ 5321–22 (23 Dec. 2016) (FY17 NDAA).

Congress directed the President to prescribe regulations implementing the MJA and legislated that the MJA would take effect no later than 1 January 2019. *Id.* at § 5542(a). Congress also directed the President to "prescribe in regulations whether, and to what extent [the MJA] shall apply to a case in which one or more actions under [the UCMJ] have been taken before the effective date of [the MJA]."[4] *Id.* at § 5542(c)(1). The following year, as part of the National Defense Authorization Act for Fiscal Year 2018, Congress directed "clarifying amendments" be made to the MJA. Pub. L. No. 115-91, §§ 531–38 (12 Dec. 2017) (FY18 NDAA). One such amendment modified § 5542(c)(1) of the FY17 NDAA. As modified, that provision directed to the President to pre-

---

[3] The act is part of the National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, §§ 5001–5542 (23 Dec. 2016) (FY17 NDAA).

[4] Pursuant to § 5542(c)(1) of the FY17 NDAA, none of the Military Justice Act of 2016 provisions apply to cases referred to trial by court-martial before the amendments' effective date, unless the act provides otherwise.

scribe regulations regarding "whether, and to what extent" the MJA would apply to cases in which a specification alleges the commission of an offense prior to 1 January 2019. *Id.* at § 531(n)(1).

Just under four months after the FY18 NDAA was enacted, the President signed Executive Order 13,825, designating 1 January 2019 as the effective date of the MJA, thereby implementing a broad swath of amendments to the *Manual for Courts-Martial*, to include the Rules for Courts-Martial covering post-trial processing. 83 Fed. Reg. 9889, § 5 (8 Mar. 2018). Relevant here is the fact one of those amendments did away with the requirement in R.C.M. 1106 for convening authorities to obtain written legal advice before taking action. Instead, the new R.C.M. 1109(d)(2) requires convening authorities to consult with the staff judge advocate or legal advisor "[i]n determining whether to take action, or to decline taking action," but does not require that consultation be reduced to writing. The new R.C.M. 1109 also outlines the process for and limitations on convening authorities deciding whether to take action or not.

Another provision of the executive order directs the version of Article 60, UCMJ,

> in effect on the date of the earliest offense of which the accused was found guilty[ ] shall apply to the convening authority . . . to the extent that Article 60: . . . requires action by the convening authority on the sentence . . . or . . . authorizes the convening authority to approve, disapprove, commute, or suspend a sentence in whole or in part.

83 Fed. Reg. 9889 at 9890. Thus, the executive order seemingly called upon convening authorities to affirmatively take action under the earlier version of Article 60, UCMJ, in certain cases, even when such action would be taking place after 1 January 2019. At the same time, the new version of R.C.M. 1109 would be in effect, which indicated convening authority action had become permissive instead of mandatory.

Significant litigation over both the legality and the meaning of this executive order provision ensued. *See, e.g.*, *United States v. Coffman*, 79 M.J. 820 (A. Ct. Crim. App. 2020); *United States v. Aumont*, No. ACM 39673, 2020 CCA LEXIS 416 (A.F. Ct. Crim. App. 20 Nov. 2020) (en banc) (unpub. op.). Eventually the question of whether the provision required convening authorities to affirmatively take action on cases involving specifications alleging pre-1 January 2019 offenses was decided by the United States Court of Appeals for the Armed Forces (CAAF) in the case of *United States v. Brubaker-Escobar*, 81 M.J. 471, 473 (C.A.A.F. 2021) (per curiam). In that case, the CAAF concluded the executive order "was a valid exercise of the President's rulemaking authority," and that convening authorities in such cases must take action as required by

the pre-MJA version of Article 60, UCMJ. *Id.* at 473. The CAAF further concluded a convening authority's failure to take action in cases referred after 1 January 2019 is a procedural error "test[ed] for material prejudice to a substantial right to determine whether relief is warranted." *Id.* at 475 (quoting *United States v. Alexander*, 61 M.J. 266, 269 (C.A.A.F. 2005)). The court reasoned that a failure to take action is no longer a jurisdictional error because the new version of Article 66, UCMJ, 10 U.S.C. § 866, implemented by the MJA provides the Courts of Criminal Appeals jurisdiction upon entry of judgment by a military judge, as opposed to action by the convening authority. *Id*. at 474–75.

### 2. Analysis

Appellant points to the fact the pre-MJA Article 60, UCMJ, required a written recommendation from the staff judge advocate prior to convening authority action, but the post-MJA R.C.M. 1109 does not. Appellant argues this inconsistency amounts to the President exceeding his authority by acting in a legislative capacity—an authority vested in Congress under the Constitution. Specifically, Appellant contends that while the President could promulgate rules to implement Article 60, UCMJ, the President was compelled to require adherence to the entirety of Article 60, UCMJ, and not just portions of it. In other words, Appellant argues the President could validly direct convening authorities to affirmatively take action under the old Article 60, UCMJ, in cases alleging pre-1 January 2019 offenses, but he could not simultaneously relieve convening authorities of the requirement to obtain written legal advice—a requirement found in that same article.

Congress has assigned to the President authority to prescribe rules and regulations relating to pretrial, trial, and post-trial procedures so long as such rules and regulations are neither contrary to nor inconsistent with the UCMJ. Article 36(a), UCMJ, 10 U.S.C. § 36(a). Pursuant to the FY17 NDAA, as amended by the FY18 NDAA, Congress granted the President the authority to issue regulations that define "whether, and to what extent" the MJA would apply in cases such as Appellant's.

We do not construe Executive Order 13,825 to be contrary to or inconsistent with the UCMJ—instead, the portion of the order relevant here simply dictates the timing of the implementation of the MJA's amendments to the UCMJ in certain cases. Congress expressly authorized the President to determine "whether, and to what extent" those amendments would apply when pre-1 January 2019 offenses are involved, and we see nothing in the MJA or the two defense authorization acts which could be read to require the President to only issue regulations pertaining to entire UCMJ articles. A plain reading of the phrase "to what extent" leads us to conclude Congress intended to give the

President discretion to apply provisions of the UCMJ to such cases as the President saw fit. Had Congress intended to limit the President's discretion in the manner Appellant suggests, Congress could have explicitly done so within the myriad of other directives found in the defense authorization acts, but Congress did not. Therefore, we conclude Congress conferred broad discretion to the Executive Branch to determine whether provisions of the MJA would apply at all to cases with pre-1 January 2019 offenses, and—if so—which provisions would apply and how.

Even if the President had exceeded his authority in effectively eliminating the requirement for a written legal recommendation, we are hard-pressed to identify any potential prejudice to Appellant. The convening authority had no power to disapprove the findings or grant Appellant any clemency with respect to the adjudged confinement and dismissal, leaving only the reprimand subject to the convening authority's discretion. Moreover, Appellant did not request any specific relief from the convening authority—instead, he just asked for leniency. Since the most leniency the convening authority could grant was disapproval of Appellant's reprimand, we are convinced Appellant was not prejudiced by the lack of a written legal analysis on that point.

### C. Congressional Delegation to the President

Notwithstanding the question of whether the President acted within the limits of his authority under the FY17 and FY18 NDAAs, Appellant argues Congress impermissibly delegated this authority to the President in the first place. Appellant bases his argument on the premise that Congress' grant of authority to the President to decide "whether, and to what extent" the MJA provisions would apply was so broad and unqualified that it amounted to Congress abdicating its legislative role in violation of the so-called nondelegation doctrine.

#### 1. Law

The nondelegation doctrine basically espouses the principle that the separation of powers in the United States Government "generally" prohibits Congress from delegating its legislative power to either of the other two branches of government. *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989). The doctrine does not, however, "prevent Congress from obtaining the assistance of its coordinate [b]ranches." *Id.* at 372. Such assistance is allowed so long as Congress "lay[s] down by legislative act an intelligible principle" to which the other branch is directed to conform. *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). The Supreme Court has recognized "Congress cannot do its job absent an ability to delegate power under broad general directives." *Mistretta*, 488 U.S. at 373. As a result, the Court has found no violation of the nondelegation doctrine when "Congress clearly delineates the general policy,

the public agency which is to apply it, and the boundaries of this delegated authority." *Id.* at 373–74 (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).

### 2. Analysis

Despite the doctrine's prohibitive sounding name, the Supreme Court has rarely relied on it to invalidate congressional action.[5] For example, in the military context, the Supreme Court found no violation of the doctrine where Congress delegated to the President the authority to establish criminal penalties and to define aggravating factors which permit death sentences. *Loving v. United States*, 517 U.S. 748, 768–69 (1996). Indeed, the Supreme Court has only twice invalidated laws based upon the doctrine, and both of those cases were decided in 1935.[6] This likely explains why Appellant largely supports his argument by citing to the dissenting opinion in *Gundy v. United States*, 139 S. Ct. 2116 (2019).

In *Gundy*, the Supreme Court considered whether the federal Sex Offender Registration and Notification Act (SORNA) violated the doctrine insofar as the act authorized the Attorney General to determine how the law would apply to offenders convicted before the law's enactment.[7] *Id.* at 2122. A four-Justice plurality concluded the delegation constitutionally permitted the Attorney General to resolve such issues as how to apply the law to "pre-Act" offenders who had already been released from prison or who had never previously been required to register under a particular state's then-existing scheme; that is, to address "practical problems" in the implementation of the law as "a stopgap, and nothing more." *Id.* at 2124–25 (citing *Reynolds v. United States*, 565 U.S. 432, 440 (2012)). In reaching this conclusion, the Court considered the overall purpose of the law and the fact that the law did not grant the Attorney General limitless authority, but rather applied only to people who had committed their offenses prior to the law's enactment. *Id.* at 2126–27. The three-Justice dissent, on the other hand, contended the Attorney General had been given "unfettered discretion to decide which requirements to impose on which pre-Act offenders" because Congress itself had been unable to reach consensus over how the law

---

[5] *See, e.g.*, Keith E. Whittington & Jason Iuliano, *The Myth of the Nondelegation Doctrine*, 165 U. Pa. L. Rev. 379 (2017).

[6] *See A. L. A. Schechter Poultry Corp. v. United States*, 295 U. S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U. S. 388 (1935).

[7] The purpose of the law was to provide consistent registration requirements across the country in light of the wide disparities in state registration laws. *Gundy*, 139 S. Ct. at 2121.

should apply to such offenders. *Id.* at 2143 (Gorsuch, J., dissenting). Meanwhile, Justice Alito concurred with the majority, but expressed a willingness "to reconsider the approach we have taken for the past 84 years," but he did not wish to do so solely with respect to the issue at hand. *Id.* at 2130–31 (Alito, J., concurring).[8]

We decline Appellant's invitation to find in his favor based upon a dissenting opinion. Instead, the Supreme Court's opinion in *Gundy* compels a conclusion adverse to Appellant's position. We reach this determination in no small part due to the similarity between the SORNA delegation and that found in the MJA. In both cases, the delegations pertained to the applicability of new legal provisions to people who found themselves subject to the laws on those laws' effective dates when some triggering event had already occurred.

In *Gundy*, the people at issue were those who had committed registerable sex offenses prior to the law being passed, and the Attorney General was given discretion to determine how to go about applying the new registration requirements to those offenders. In the instant case, some number of servicemembers—like Appellant—had committed offenses prior to the MJA's effective date, but faced court-martial proceedings after that effective date. Similar to the Attorney General in *Gundy*, the President was given discretion to determine how the new act's provisions would apply to that discrete population of servicemembers. In one sense, the delegation was broad in that it permitted the President to choose which of the MJA's extensive amendments to apply to these servicemembers. But that broad discretion is sharply tempered by the fact the only servicemembers in question are those who had committed offenses—or had some action taken under the UCMJ—prior to 1 January 2019 and whose offenses were referred to trial after that date. Thus, the President was generally only given the authority to determine which provisions of the MJA would continue to apply in such cases after the 1 January 2019 effective date passed.

The need to determine how to apply the MJA provisions to these "gap" cases is not difficult to grasp, as court-martial processing—not to mention criminal conduct—does not stop and start neatly at the end of calendar years. Building some degree of flexibility into the implementation of the law was a virtual ne-

---

[8] Justice Kavanaugh did not participate in the decision. Appellant notes that five months after *Gundy* was decided, Justice Kavanaugh commented favorably on Justice Gorsuch's *Gundy* dissent when he concurred in a denial of certiorari in an unrelated case, *Paul v. United States*, 140 S. Ct. 342 (2019). While that may be true, our task is to apply the law and not to try and predict if or how the Supreme Court might chart some new and different course in this arena.

cessity to mitigate the upheaval such a major revision of the UCMJ would entail. But the question is not whether that goal was justified or not—the question is whether Congress could constitutionally delegate the matter to the President. We answer that question in the affirmative.

As previously noted, Congress may permissibly obtain the assistance of the Executive Branch so long as Congress sets out an "intelligible principle" guiding that assistance. *J.W. Hampton, Jr., & Co.,* 276 U.S. at 409. The "intelligible principle" of Congress' delegation here was simply to determine how to apply the MJA amendments to the limited number of cases in which the convicted offenses spanned 1 January 2019. The delegation did no more. It is true that Congress did not provide the President with any guidance in the MJA itself on how to make this determination, but context is important: the President is the Commander in Chief of the armed forces, ultimately responsible for military discipline.[9] As the Supreme Court explained in *Loving*, "The delegated duty, then, is interlinked with duties already assigned to the President by express terms of the Constitution, and the same limitations on delegation do not apply where the entity exercising the delegated authority itself possesses independent authority over the subject matter.'" 517 U.S. at 772 (quoting *United States v. Mazurie*, 419 U.S. 544, 556–57 (1975)).

The changes enacted by the MJA pertain to the UCMJ and its implementing rules and regulations, all found in the *Manual for Courts-Martial*. As the preamble to the manual explains, "The purpose of military law is to promote justice, to assist in maintaining good order and discipline in the armed forces, to promote efficiency and effectiveness in the military establishment, and thereby to strengthen the national security of the United States." *Manual for Courts-Martial*, *United States*, Preamble, pt. I-1, ¶ 3 (2019 ed.). Moreover, the UCMJ itself is solely concerned with addressing criminal conduct committed by servicemembers, further limiting the overall scope of the issue at hand. Thus, the purpose of the MJA amendments, and by extension the President's implementation of them in his unique role as commander in chief, is to support the execution of the military justice system as a function of national security. In the end, the President was granted limited authority over a limited number of cases for the limited purpose of implementing Congress' amendments to the UCMJ, and we see no support for the argument Congress' delegation of this authority was unconstitutional.

---

[9] Justice Alito has remarked, "Courts-martial are older than the Republic and have always been understood to be Executive Branch entities that help the President, as Commander in Chief, to discipline the Armed Forces." *Ortiz v. United States*, 138 S. Ct. 2165, 2190 (2018) (Alito, J., dissenting).

Even as we come to this conclusion, we note that a contrary determination would not provide Appellant with the written legal recommendation he seeks. If Congress' delegation was impermissible, then Appellant's entire post-trial processing would have fallen under the UCMJ as amended by the MJA, as that processing occurred after 1 January 2019. Thus, Appellant would have been entitled to neither affirmative convening authority action nor a written legal recommendation, as both of those requirements are only found in the law as it existed prior to that date.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court